

# EXCLUSIVE AUCTION AND SALES AGREEMENT

This Exclusive Auction and Sales Agreement ("*Agreement*") is made as of March 4, 2021 (the "*Effective Date*") between **Larry S. Eide, not individually but solely in his capacity as Chapter 7 Trustee of the Bankruptcy Estate of Simply Essentials, LLC, Debtor**, 103 E. State Street, Suite 800, Mason City, Iowa 50401 (mailing address P.O. Box 1588, Mason City, Iowa 50402-1588), Tel: (641) 423-4264, Email: eide@pappajohnlaw.com ("**Trustee**") and **Heritage Global Partners, Inc.**, a California corporation, Hacienda Del Mar, 12625 High Bluff Drive, Suite 305, San Diego, CA  92130, Attn:  Nick Dove, Tel: (858) 847-0659, Email: ndove@hginc.com ("**HGP**") and **Harry Davis LLC**, a Pennsylvania limited liability company, 1725 Blvd. of Allies, Pittsburgh, PA 15219, Attn: Leonard Davis, Tel: (412) 901-0895, Email: ldavis@harrydavis.com ("**Harry Davis**"; Harry Davis and HGP are referred to hereinafter, collectively, as "**Auctioneer**").

WHEREAS, on March 6, 2020, a petition for relief under Chapter 7 of the United States Bankruptcy Code was filed against Simply Essentials, LLC. ("*Debtor*") in the United States Bankruptcy Court for the Northern District of Iowa (the "*Court*"), Case No. 20-00305;

WHEREAS, an Order for Relief was entered by the United States Bankruptcy Court for the Northern District of Iowa on September 22, 2020, and Trustee was thereafter appointed Chapter 7 Trustee of the Debtor's estate; and

WHEREAS, Trustee wishes to sell certain assets, and Auctioneer has agreed to conduct a privately negotiated sale or public auction sale on the terms and conditions set forth below;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are mutually acknowledged, Auctioneer and Trustee agree as follows:

**1**. **REPRESENTATION**: Subject to an Order of the Court approving the retention of Auctioneer hereunder (the "*Retention Order*"), Trustee agrees to retain Auctioneer on an exclusive basis to conduct a sale process pursuant to which Auctioneer shall endeavor to locate a single "turnkey" buyer of substantially all of the assets described on **Exhibit A** attached hereto (the "*Assets*") in bulk (the "*Turnkey Sale Process*") and, in the event Auctioneer's efforts do not result in locating a single "turnkey" buyer at a price acceptable to Trustee as of the conclusion of the Turnkey Sale Process, Auctioneer shall then prepare for, market and conduct a public auction sale of the Assets on a piecemeal basis (the "*Auction*"), subject to the provisions of this Agreement and the approval of the Court.  The Turnkey Sale Process and the Auction are alternatively referred to hereafter, collectively, as the "*Sale*."  In the event Auctioneer is required by local bankruptcy rules to obtain an auctioneer bond, Trustee shall reimburse Auctioneer for all costs and expenses incurred in obtaining said bond in the same manner as the Sale Expenses as described in Section 5 of this Agreement.

**2. CONDUCT OF THE SALE:**

(a)    The Turnkey Sale Process will commence upon the entry of the Retention Order and shall continue for a period of 100 days, provided Trustee may, at his option and subject to Trustee providing notice to Auctioneer, elect in his discretion to shorten or lengthen said period based upon the level of activity reported by Auctioneer.  During the Turnkey Sale Process, Auctioneer shall seek to locate a single turnkey buyer to effectuate a purchase of all of the Assets in bulk.  In the event a turnkey buyer is not located prior to the conclusion of the Turnkey Sale Process, the Auction will be conducted on a date to be mutually agreed upon by Trustee and Auctioneer.  At all times the Sale will be conducted online at

Case 20-00305    Doc 90-1    Filed 03/19/21    Entered 03/19/21 12:23:22    Desc Exhibit
Heritage Employment Agreement    Page 2 of 8

www.HGPauction.com or www.HarryDavis.com (the "Website") through an internet provider designated by the Auctioneer (the "Internet Provider"). Trustee agrees that Auctioneer may use his and Debtor's name, street address and logo in its advertising in accordance with Auctioneer's customary practice, including on its Website as well as in any press release, solely to perform services under this Agreement.

(b)  With respect to the Turnkey Sale Process, Auctioneer shall communicate all credible offers to the Trustee; Trustee shall have absolute discretion to determine whether any bid is acceptable. In the event Trustee deems a turnkey bid to be acceptable, Trustee shall be responsible for the preparation of all necessary agreements and documentation with respect to the turnkey bid and notice said offer out for higher and better offers under the auspices of the Court and otherwise subject to the terms of this Agreement. In the event the Assets are not sold to a single buyer during the Turnkey Sale Process and thus go to Auction, all Assets in the Auction shall be sold to the highest bidder regardless of price (subject only to the purchaser's timely payment in full and removal of purchased Assets). Auctioneer, however, does not guarantee that any sale will be completed, and Auctioneer is not responsible in the event that a purchaser fails to live up to its agreement and complete a purchase.

(c)  The parties acknowledge that any Turnkey Sale is subject to Court approval, and that advance approval of the Auction is also required. Trustee is responsible to obtain the Court's approval.

**3. DISCLAIMERS OF WARRANTIES**: Auctioneer shall state both in its advertising for the Sale and at the Sale that all Assets are being sold "as is, where is and with all faults" and with any additional disclaimers of warranty, including disclaimers of the warranties of merchantability and fitness for a particular purpose (but excluding any in-place transferable maintenance agreements). Trustee acknowledges and agrees that Auctioneer has no knowledge with respect to, and has no obligation to investigate, the merchantability or fitness for any particular use of any Asset.

**4. COMPENSATION**:

(a)  <u>Turnkey Sale Process</u>. Auctioneer shall charge Trustee a five percent (5%) commission (the "*Commission*") in the event the Assets are sold to a single buyer at or as a result of the Turnkey Sale Process, provided the Commission shall be reduced to three percent (3%) in the event the Minnesota Growers Group or Pitman Farms is the successful purchaser.

(b)  <u>Auction</u>. In the event the Assets are sold via Auction, Auctioneer shall charge each successful Auction bidder its standard buyer's premium (the "*Buyer's Premium*") for its own account as compensation for Auction services provided up to and including the actual Auction event. In addition, each successful Auction bidder will be charged the standard buyer's premium of the Internet Provider (the "*Internet Buyer's Premium*") for the account of Internet Provider. The Buyer's Premium and the Internet Buyer's Premium shall be collected by Auctioneer directly from each Auction purchaser in addition to the purchase price as bid for such Auction services. Payment to the Auctioneer of such Buyer's Premium by the successful bidder is not dependent on any other service provided by the Auctioneer in connection with the Auction subsequent to the actual Auction event, if any. The Buyer's Premium and the Internet Buyer's Premium shall not exceed eighteen percent (18%) of the bid price. Secured creditors may submits a "credit bid" pursuant to Section 363(k) of the Bankruptcy Code during the Auction and, in such case, the Buyer's Premium and the Internet Buyer's Premium shall be charged against the bid increment necessary for the secured creditor to be the successful bidder; *provided*, *however*, that the secured creditor may optionally credit bid higher than necessary to be the successful bidder (an "*Excessive Bid*") and that, in such case, the Buyer's Premium and the Internet Buyer's Premium shall not be charged against the Excessive Bid amount.

(c)  <u>Estate Carve-Out</u>. Auctioneer shall remit a carve-out to the Trustee (the "*Estate Carve-Out*") in the amount of 75 basis points (0.75%) of (i) the purchase price, if the Assets are sold by the Turnkey Sale Process, or (ii) the gross proceeds, if the Assets are sold at Auction.

(d)  Trustee shall not be liable to Auctioneer for Commission, Buyer's Premium, or Internet Buyer's Premium in the event that a purchaser fails to live up to its agreement and complete a purchase.

Simplyessentials.HGP.HarryDavis.3.11.21 FINAL             -2-

(e)    Trustee shall not be liable to Auctioneer for Commission, Buyer's Premium, or Internet Buyer's Premium in the event that a secured creditor submits a "credit bid" pursuant to Section 363(k) of the Bankruptcy Code for the Turnkey Sale Process or Auction.

**5. SALE EXPENSES:**

(a)    <u>Turnkey Sale Process</u>.  Trustee shall provide Auctioneer with a $25,000 stipend (the "*Turnkey Allowance*"), to be advanced by Auctioneer and reimbursed by Trustee, for all expenses necessary to prepare, market and conduct the Turnkey Sale Process.

(b)    <u>Auction</u>.  In the event the Assets are not sold during the Turnkey Sale Process and Auctioneer thus prepares and conducts the Auction, Trustee agrees to reimburse Auctioneer (in addition to and separate and distinct from the Turnkey Allowance) for all expenses incurred to prepare, market and conduct the Auction, including but not necessarily limited to advertising and marketing, labor, travel, lodging, sustenance and miscellaneous expenses directly relating to the Auction, in the amount of $15,000.  Trustee acknowledges and agrees that in the event the Assets are sold via Auction, the Auction Allowance shall be deducted from the gross proceeds and paid to Auctioneer following the Auction.  For purposes of this Agreement, "gross proceeds" means all revenue from the sale of Assets pursuant to this Agreement, excluding (i) any sales taxes collected by Auctioneer, and (ii) any Buyer's Premium and Internet Buyer's Premium collected pursuant to Section 4.  Notwithstanding the foregoing, Trustee acknowledges and agrees that in the event Trustee requests changes to the Assets or to the Auctioneer's set-up, Auction date or check-out plans (which changes may only be made with Auctioneer's and Trustee's written consent), and such changes result in additional expenses, Trustee shall be responsible for reimbursement of any such additional expenses.

**6**. **PRE- SALE ASSET TRANSACTIONS**:  Prior to the Sale, Trustee may not withdraw, sell or otherwise dispose of any of the Assets listed in Exhibit A.   Any withdrawals prior to the Sale shall be subject to compensation to Auctioneer pursuant to this Agreement.

**7. COLLECTION AND DISBURSEMENT OF SALE PROCEEDS:**

(a) Auctioneer shall collect from the purchasers of the Assets the gross proceeds, any applicable sales taxes and amounts due as Buyer's Premium and Internet Buyer's Premium and deposit such funds into a bank depository account.  All applicable sales taxes collected by Auctioneer shall be paid to the appropriate taxing authorities out of the account and the Internet Buyer's Premium shall be paid to the Internet Provider out of the account. Thereafter, no later than 30 calendar days after the Sale, Trustee shall be wired the net Sale proceeds (after Auctioneer has been paid from the account the applicable Auction Allowance (and Turnkey Sale Allowance, if applicable) and amounts allocable to Commission (if the Assets were sold via the Turnkey Sale Process) or Buyer's Premium and the Internet Buyer's Premium (if the Assets were sold via Auction)), subject to open items or uncollected accounts, if any (the "*Net Sale Proceeds*"), to which all liens of the secured creditors shall attach.  Auctioneer shall not be liable for collection of the purchase price for any Assets bid upon at the Auction unless Auctioneer authorizes their release for removal by the purchaser.

(b) No later than 30 calendar days after the Sale, Auctioneer shall also issue to Trustee a settlement report (the "*Settlement Report*") showing, generally, a record of sales of the Assets and the allocation of the funds generated by such sales, subject to open items or uncollected accounts, if any. Trustee acknowledges and agrees that all information that will be contained in the Settlement Report constitutes confidential and proprietary information of Auctioneer. Trustee agrees that neither the Settlement Report nor any piece of information contained in the Settlement Report may be shared with, copied or distributed to any third party or as otherwise required for compliance with applicable Court requirements without Auctioneer's prior written consent.

(c)    Trustee shall have sole responsibility for obtaining all court approvals necessary in connection with the settlement of Trustee's account. In the event Auctioneer is required by applicable local

court rule to post an auctioneer bond, any such bond shall, by its terms, terminate upon receipt of the Net Sale Proceeds and the Auctioneer's filing of the Settlement Report provided Trustee has indicated its acceptance of such Settlement Report. Further, Trustee shall cooperate with Auctioneer to the extent reasonably necessary to facilitate the release of any such bond upon Auctioneer's fulfillment of its obligations hereunder.

(d)    Notwithstanding the provisions of Section 726(b) of the Bankruptcy Code, in all instances where the terms of this Agreement permit Auctioneer to retain proceeds received from sales of the Assets (as compensation for Sale services, as reimbursement for expenses incurred in connection with the Sale or otherwise), Auctioneer shall have right to retain such proceeds without further order of the Court and without obtaining the approval of Trustee or any other party. Trustee will promptly seek approval of the compensation and expense reimbursement to Auctioneer as required under Section 328 of the Bankruptcy Code.

**8. ASSET TRANSPORTATION; RIGHT OF SURRENDER**: If needed, Asset transportation to the sale facility prior to the Sale shall be arranged and paid for by Trustee, including, but not necessarily limited to, the cost of relocation of the rolling stock included in the Assets. In the event that walls or other structures must be removed or modified to remove the Assets sold at the Sale, all supervision of such removal and modification shall be borne directly by the Auctioneer, provided the expense of such removal and modification shall be borne solely by the respective Asset purchaser(s). Any labor costs that Trustee directly or indirectly incurs in connection with the Sale shall be borne directly by Trustee and are not included in the Auction Allowance. In the event that some Assets remain unsold at the conclusion of the Sale, or a purchaser fails to perform his obligation to pay the purchase price of an Asset, then Auctioneer shall surrender the Assets to Trustee and will have no further obligation with respect to such Assets ("*Unsold Assets*").

**9. UTILITY DISCONNECTION AND ASSET REMOVAL**: Immediately after the conclusion of the Sale, the respective Asset purchaser(s) shall disconnect all utilities to the sold Assets in a reasonable manner designed to protect the Asset and the facility. Thereafter, the purchaser(s) shall be solely responsible for rigging and shipping the sold Assets. Trustee acknowledges and agrees that sold Assets will be released to the respective purchaser(s) once Auctioneer confirms that the respective purchaser has paid Auctioneer in full for all Assets purchased at the Sale. Under no circumstances shall Auctioneer be responsible for any loss, damage or destruction associated with asset removal or disconnection, except to the extent that such loss damage or destruction results from the negligence of Auctioneer. Trustee acknowledges that with respect to any export transaction involving any of the Assets sold hereunder, and unless Trustee and purchaser agree otherwise, Trustee shall cooperate with buyers, their agents, customs officials or similar parties for the purposes of completing a Shipper's Export Declaration form or any documentation necessary to facilitate the respective purchaser's export of the purchased Assets.

**10. INSURANCE**: Trustee shall be solely responsible for maintaining adequate insurance coverage pertaining to the Assets and their transfer to and from, and storage at, Sale sites. If the Sale is to occur at premises owned or leased by Trustee, Trustee also shall maintain adequate liability insurance for the duration of the Sale and related activities. Auctioneer shall carry all workers' compensation insurance for Auctioneer's employees in compliance with all applicable state and local laws.

**11. DESTRUCTION OF ASSETS:** If the Assets go to sale via Auction, in the event of any loss, damage or destruction of any Assets, whether before or after the Auction, Trustee shall remain liable to Auctioneer for Auctioneer's reimbursable expenses under Section 5(b). In the event of loss, damage or destruction of any Assets after sale at the Auction but prior to removal by the respective purchasers, Auctioneer also shall be entitled to an amount equal to its compensation (Buyer's Premium) earned under Section 4, except to the extent that such loss, damage or destruction results from the negligence of Auctioneer or the purchaser. Trustee agrees that, upon collection of any insurance proceeds payable on account of the destruction of any or all of the Assets after sale but prior to payment by a purchaser, Trustee shall pay to Auctioneer a portion of such proceeds sufficient to pay Auctioneer's reimbursable expenses under Section 5, any applicable sales taxes and amounts earned as compensation under Section 4

(collectively, the "*Recovery Obligations*"). The obligation from the preceding sentence shall survive until Trustee has paid to Auctioneer all amounts owing under the Recovery Obligations.

**12. USE OF PREMISES**:

(a) For the purposes of this Agreement, the "*Premises*" shall mean 901 N. Main Street and 300 Lawler Street, Charles City, Iowa or such other location as determined by mutual agreement of both Trustee and Auctioneer. Trustee authorizes Auctioneer and its representatives to enter upon and use the Premises for the purposes of (i) storing the Assets thereupon, (ii) preparing for and conducting sales of the Assets, (iii) otherwise exhibiting the Assets to prospective purchasers, and (iv) for such other purposes as are reasonable and necessary to conduct the Sales. Trustee agrees that Auctioneer shall not be charged a fee for the use of the Premises. Trustee further agrees that it shall furnish utilities to the Premises, at Trustee's sole expense.

(b) Trustee acknowledges and agrees that Auctioneer has no interest of any kind or nature in the Premises, and that Auctioneer has no knowledge as to any previous use or occupancy of the Premises. Trustee acknowledges and agrees that Auctioneer shall not be responsible for damage or injury to the Premises resulting from or arising in connection with the sale or removal of the Assets, except to the extent that such damage or injury is caused by Auctioneer's negligence.

**13. REPRESENTATIONS AND WARRANTIES:** Trustee represents and warrants to Auctioneer as follows:

(a) Subject to the entry of the Retention Order, Trustee is authorized to execute and perform this Agreement, and this Agreement constitutes a valid and legally binding obligation of Trustee, enforceable in accordance with its terms. Auctioneer acknowledges that this Agreement requires Court approval.

(b) To the best of the knowledge of the Trustee, Trustee now holds (and, up to the moment of the Sale or other sale provided for under this Agreement, will hold) good and marketable title to all Assets and has the ability, subject to the applicable Court order, to convey said Assets free and clear of any lien, security interest, leasehold interest, co-ownership interest or any other type of encumbrance or interest.

(c) To the knowledge of the Trustee, none of the Assets infringes or violates (or contains any parts or components which infringe or violate) any third party's copyright, patent, trademark, trade secret or other proprietary rights.

(d) [Intentionally omitted].

(e) To Trustee's actual knowledge, no Hazardous Substances are contained in or made a part of the Assets. For purposes of this Agreement, the term 'Hazardous Substances' shall mean, either individually or collectively, any chemical, solid, liquid, gas, or other substance having the characteristics identified in, listed under, or designated pursuant to (i) the Comprehensive Environmental Response, Compensation and liability Act of 1980 (CERCLA) as amended, 42 USCA Section 9601 (4), as a "hazardous substance," (ii) the Resource, Conservation and Recovery Act. 42 USCA Sections 6903(5) and 6921, as a "hazardous waste," or (iii) any other laws, statutes, or regulations of a government or political subdivision or agency thereof, as presenting an imminent and substantial danger to the public health or welfare or to the environment, or as otherwise requiring special handling, collection, storage, treatment, disposal, or transportation. Trustee agrees that nothing in this Agreement shall be construed to require Auctioneer to remove any Hazardous Substances that are present on the Premises or are contained in a part of the Assets.

(f) To Trustee's actual knowledge, none of the Assets or any components thereof, or related software or technology requires a U.S. Government license for export from the United States to countries other than those which are subject to comprehensive embargoes or support for terrorism (currently, Cuba, Iran, North Korea or Syria, as the same may change from time to time) except those specifically listed in

writing delivered by Trustee to Auctioneer, with the respective Export Control Classification Numbers for such listed Assets.

Trustee acknowledges and agrees that Auctioneer is relying on the foregoing representations and warranties in proceeding to conduct the Sale or sales provided for under this Agreement.

**14. LIMITATION OF LIABILITY**: Except with respect to the payment of the net sales proceeds to the Trustee, Auctioneer's maximum liability for the breach of any obligation in connection with this Agreement or the Sale, and for any and all damages of any type or nature (whether in contract, tort or otherwise) sustained or claimed by Trustee or any other person or entity in connection with this Agreement or the Sale, shall be limited to the amounts actually received by Auctioneer as compensation under this Agreement.  **NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR PUNITIVE, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES, INCLUDING WITHOUT LIMITATION, LIABILITY FOR LOSS OF USE, LOSS OF PROFITS, LOSS OF PRODUCT OR BUSINESS INTERRUPTION HOWEVER THE SAME MAY BE CAUSED, INCLUDING FAULT OR NEGLIGENCE OF EITHER PARTY.**

**15. TECHNOLOGY DISCLAIMER: AUCTIONEER DOES NOT WARRANT THAT THE FUNCTIONS, FEATURES OR CONTENT CONTAINED IN THE AUCTIONEER'S WEBSITE OR THE INTERNET PROVIDER'S WEBSITE, INCLUDING ANY THIRD-PARTY SOFTWARE, PRODUCTS OR OTHER MATERIALS USED IN CONNECTION WITH THESE WEBSITES, WILL BE TIMELY, SECURE, UNINTERRUPTED OR ERROR·FREE, OR THAT DEFECTS WILL BE CORRECTED.**

**16. INDEPENDENT PARTIES**: This Agreement shall not be construed (i) to create a partnership or joint venture between Trustee and Auctioneer, or (ii) to imply that Auctioneer is buying the assets of, or any interest in, Trustee.

**17. COUNTERPARTS; FACSIMILE OR EMAIL SIGNATURES**: This Agreement may be executed in any number of counterparts, each of which, when executed, will be deemed to be an original and all of which, when taken together, will be deemed to be but one and the same instrument. Delivering signatures via facsimile or electronic mail shall be an acceptable means of executing this Agreement, and signatures so delivered shall be fully binding on the signing party.

**18. GOVERNING LAW; JURISDICTION**: This Agreement shall be governed by, and construed and enforced in accordance with, the substantive laws of the State of Iowa as applied to agreements made in Iowa, without regard to choice of law principles and the applicable provisions of the United States Bankruptcy Code.  Any action or proceeding arising under this Agreement will lie within the exclusive jurisdiction of the Bankruptcy Court, which shall hear any such action upon motion and as a core matter without a jury.

**19. SEVERABILITY**: The provisions of this Agreement shall be severable. Should any part, term or provision of this Agreement be construed by any court of competent jurisdiction to be illegal, invalid or unenforceable for any reason, the legality, validity and enforceability of the remaining parts, terms and provisions shall not be affected thereby.

**20. COMPLETE AGREEMENT**: This Agreement constitutes the entire understanding between the parties and replaces any and all prior agreements related to the Sale. This Agreement may not be modified or amended except in writing signed by all parties.

[*The remainder of this page is intentionally blank.  Signatures on following page.*]

IN WITNESS WHEROF, the parties have executed this Agreement as of the Effective Date.

| | |
|---|---|
| Larry S. Eide, not individually but in his capacity As Chapter 7 Trustee | Heritage Global Partners, Inc. California Bond Number 6150320 |

By: *Larry Eide*

Name: Larry S. Eide

Title:　Bankruptcy Trustee

Date:　March __, 2021
　　　　3/17/2021

By: _____

Name: James Sklar

Title: EVP. General Counsel and Secretary

Date: 3/17/2021

Harry Davis LLC

By: _____

Name: Leonard Davis

Title: Member - President

Date: 3/17/2021

# EXHIBIT A

# ASSETS

1. Real estate located at 901 N. Main Street, Charles City, Floyd County, Iowa (i.e. the processing plant and office);
2. Real estate located at 300 Lawler Street, Charles City, Floyd County, Iowa (i.e. the parking lot and live shed);
3. Machinery and equipment located at the real estate, consisting principally of specialized processing equipment;
4. Office equipment, furniture and fixtures located at the real estate;
5. Supplies and packaging materials;
6. Any trademarks, website domain, and other intellectual property (but not including ARKK Food Company - Terra license, accounts receivable, notes receivable, other rights to the collection of money, and causes of action); and,
7. For the purposes of this application, all rolling stock of the Debtor which were not secured as of the commencement of the bankruptcy case are NOT part of the assets to be sold.