IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| IN RE:<br><br>SIMPLY ESSENTIALS, LLC,<br><br>Debtor. | Involuntary Chapter 7 Bankruptcy<br>Case No. 20-00305<br><br>Hon. Thad J. Collins<br><br>**OBJECTION TO TRUSTEE'S MOTION TO SELL AND FOR OTHER RELIEF 11 U.S.C. §§363(b) AND (f)); MOTION TO APPROVE BID PROCEDURES** |

COMES NOW ARKK Food Company, Inc. ("ARKK"), creditor and party in interest in this case pursuant to Bankruptcy Code § 1109, by and through its counsel, respectfully submits this objection (the "Objection") to Chapter 7 Trustee Larry S. Eide's *Trustee's Motion to Sell and for Other Relief 11 U.S.C. §§363(B) And (F)); Motion to Approve Bid Procedures* (Dkt. # 119) (the "Sale Motion"), and states as follows.

**PRELIMINARY STATEMENT**

1. ARKK supports the Trustee's effort to obtain the highest and best offer for the Assets[1] through an open and transparent auction process. The Sale Motion, however, falls short of this objective, and, as currently conceived, threatens to distribute substantially all value in the case to one creditor and another creditor who is an insider at the expense of all other creditors, while barring the Trustee and other parties in interest from objecting to those parties' claims. For the reasons stated below, the Court should deny the Sale Motion so the Trustee can propose a sale that truly maximizes the value to the estate from these "crown jewel" assets without prejudice to the rights of creditors and other parties in interest. In the alternative, the sale order should provide

---

[1] Capitalized terms used but not otherwise defined shall have the meaning given to them in the Motion.

language that protects the rights of interested parties from being prejudiced by the Sale Motion, including their right to raise objections to claims (a "Revised Proposed Order" is attached as **Exhibit A**).

2.  *First,* absent from the Sale Motion is an explanation of the marketing process undertaken by the Trustee and broker that resulted in an Accepted Bid of $9.5 million. Indeed, no factual or declarative support is provided in support of the sale. The Debtor's most recent Schedule A/B of its real and personal property (Dkt. # 80) lists the value of the Assets in excess of $27.5 million. That the Accepted Bid will only realize approximately 1/3 of the listed value warrants an exploration into whether the process has been conducted in a manner to ensure fair market value is being obtained for the Assets. This takes on outsized importance where, as here, the Assets represent substantially all value in the estate and, due to the size of the Accepted Bid, all proceeds are proposed to be shared among two parties.

3.  *Second*, the Debtor has previously notified the Court of a "New Market Tax Credit" of $31 million obtained in connection with its purchase of the poultry production and processing facilities. *See* Dkt. # 55 ¶ 5. According to the Debtor, it may incur an obligation to repay such tax credit "in the event that the poultry production and processing facility is no longer owned or operated by [the Debtor]." *Id.* The Sale Motion does not address whether the incurrence of New Market Tax Credit liability was considered, nor whether the sale would be conducted in such a manner to ensure the estate does not incur this obligation. A sale that would dispose of the assets

of the estate, siphon off their value to one creditor and one insider, and potentially saddle the estate with a new liability of $31 million is, to say the least, not in the best interests of the estate.[2]

4. *Third*, the Sale Motion contains language that could be interpreted as conceding the validity of Farmer Mac and Pitman Farm's asserted liens against certain property (*see* Sale Motion ¶¶ 19-20), as well as allowing their claims against the estate. ARKK is in the process of investigating these claims and has already discussed with the Trustee its preliminary position that all or part of Pitman Farm's claim is voidable as a preferential transfer among insiders. The Sale Motion is not the appropriate vehicle to effectively settle purported secured creditors' claims against the estate. At a minimum, revisions should be made to the order (as further discussed below) to ensure the sale does not prematurely impair the ability of the estate or any party in interest to object to these claims or the validity and/or perfection of the liens.

5. *Finally*, in addition to potentially recognizing these liens, the Sale Motion provides that these liens will attach to the proceeds of the sale (with the exception of certain costs of sale and 0.75% of the proceeds released to the Trustee for payment of administrative expenses). The sale proceeds would subsequently be divided between Farmer Mac and Pitman, with the former receiving 96% and the latter receiving 4%. The sale of substantially all assets of the estate that bakes-in a distribution to Farmer Mac and Pitman and leaves virtually no value for other creditors is the definition of a *sub rosa* plan. The order should be further revised (as discussed below) to ensure the Sale Motion does not predetermine the distribution of sale proceeds, but rather are distributed in accordance with the rights of the parties pursuant to the Bankruptcy Code.

---

[2] A Chapter 7 trustee's primary obligation is to "collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of parties in interest[.]" 11 U.S.C. § 704(a)(1)

## BACKGROUND

A.      **ARKK's Relationship to the Debtor**

6.      On September 11, 2017, ARKK and the Debtor Simply Essentials, LLC ("Debtor" or "SE") entered into a Master Broker Agreement ("MBA")[3] under which ARKK served as the "exclusive master broker for all sales of SE's productions" MBA § 1(A) and was "entitled to ***all commissions*** on those net receipts of sales, ***whether procured by [ARKK] or not***, to the extent collected by SE." MBA § 6(A) (emphasis added).

7.      A dispute arose between ARKK and SE when SE wrongfully failed to pay commissions on all SE sales, whether or not procured by ARKK. Many of SE's major customers were not included in SE's calculation of commissions. For instance, in 2018, SE withheld at least 67% of the commissions owed, which ARKK estimates should have resulted in more than $2.3 million in commissions that are still unpaid. SE also wrongfully withheld at least 2/3 of the commissions owed in 2019.

8.      ARKK was engaged in arbitration in Chicago before the American Arbitration Association of its dispute over the MBA with SE. No final award has been entered in the Arbitration Proceeding because, *inter alia*, the filing of the involuntary Petition and the resulting imposition of the § 362 stay. Recently, the arbitration proceeding has been dismissed without prejudice, in light of the continued imposition of the §362 stay.

9.      On May 21, 2021, ARKK filed its amended ARKK POC seeking unpaid commissions and expectation damages arising from breach of the MBA.

---

[3] A copy of the MBA is attached as Exhibit A to ARKK's proof of claim #28 (the "ARKK POC").

**B.     Involuntary Petition, Chapter 11 Petition, Motion to Dismiss, and Debtor Consent**

10.     On March 6, 2020, certain creditors of SE filed the involuntary bankruptcy petition against SE.

11.     On August 7, 2020, SE filed its *Motion to Dismiss the Involuntary Bankruptcy Case and Memorandum in Support of Motion to Dismiss* (Docs 31 and 32).

12.     On August 10, 2020, SE filed its voluntary Chapter 11 bankruptcy in the United States Bankruptcy Court for the Eastern District of Iowa, Fresno Division as Case No. 20-12633.

13.     On August 17, 2020, certain creditors filed their *Motion for Transfer of Venue of California Bankruptcy to the Bankruptcy Court for the Northern District of Iowa* (Dkt. #38, the "Transfer Motion"), which ARKK joined (Dkt. #50), seeking to transfer the Voluntary Case filed in the California Court to this Court.

14.     On September 8, 2020, SE filed its response to the Transfer Motion (Dkt. #55) indicating that on or before September 18, 2020 it would agree to either elect to consent to the Transfer Motion and consolidate the Voluntary Case with the Involuntary Case, or dismiss the Voluntary Case, withdraw its motion to dismiss, and consent to entry of an order for relief in this this Involuntary case.

15.     In the same response, the Debtor alerted the Court to potential New Market Tax Credit liability it may incur in a sale of the poultry production and processing facilities:

> SE is in the process of attempting to finalize negotiations with its lenders and the relevant taxing authorities as to the resolution of a 'New Market Tax Credit' that SE obtained with respect to SE's purchase of the poultry production and processing facilities in the approximate amount of $31M, and needs additional time through September 18, 2020 to complete those negotiations as a Chapter 11 debtor-in-possession. If SE is successful in these efforts, the bankruptcy estate(s) will avoid some or all of SE's obligation to repay such New Market Tax Credit in the event that the poultry production and processing facility is no longer owned or operated

       by SE, and the avoidance of such claim, in whole or part, will benefit not only the Petitioners but all other creditors of SE affected by the pending bankruptcy proceedings.

Dkt. #55 ¶ 5.

    16.    On September 18, 2020, SE withdrew its motion to dismiss and consented to entry of an order for relief pursuant to the involuntary chapter 7 petition. (Dkt. # 71).

    17.    On September 22, 2020, Larry S. Eide was appointed as Trustee. (Dkt. # 74).

    **C.**    **Schedules of Debtor's Assets and Liabilities**

    18.    On September 30, 2020, the Debtor filed its original schedules(s) A/B, D, E/F, G, H. (Dkt. # 80). Of relevance here, the Debtor valued the processing plant at $4 million, the parking lot and live shed at $500,000, and its machinery and equipment at ~$23 million, for a combined value of ~$27.5 million.

    19.    On March 4, 2021, the Debtor filed amended schedules D (Dkt. #89) and E/F (Dkt. #88). In the schedules E/F, Pitman Farms' $4,915,000 claim was listed as secured by the rolling stock and all machinery and equipment. Farmer Mac's ~$13 million claim was listed as secured by the processing plant and machinery and equipment.

    20.    In its amended schedules, the Debtor valued its total assets at ~$29.5 million and its total liabilities at ~$150 million, consisting of $18.131 million in secured claims and $132.207 million in unsecured claims. Pitman Farms is listed as holding unsecured claims in the amount of ~$95.6 million and secured claims in the amount of ~$5 million. The schedules also list over $6 million in transfers that were made by the Debtor to Pitman Farms in the one year before the involuntary petition.

21. On November 23, 2020, Pitman Farms filed a proof of claim for its purported ~$5 million secured claim. The claim is based on a loan agreement dated June 2, 2019 signed by David Pitman for both lender and borrower.

**D.     The Sale Motion**

22. On June 21, 2021, the Trustee filed the proposed sale order (the "Proposed Order") and related exhibits. The same day, the Trustee provided notice setting the bar date for objections to the sale for July 12, 2021. The Trustee also noticed for sale various rolling stock, including 14 semi-trailers and one semi-tractor. (Dkt. # 116).

23. On June 22, 2021, the Trustee filed the Sale Motion.

**E.     ARKK Attempted to Resolve its Concerns Regarding the Sale Motion**

24. As mentioned in the outset, ARKK is not trying to disrupt the sale of substantially all of the Debtor assets, but merely desires to ensure that such sale will maximize recoveries to all parties in interest. In line with that goal, On July 6, 2021, ARKK emailed the Trustee to express its concerns with the Sale Motion and Proposed Order. ARKK provided the Trustee with revisions to the Proposed Order in the form attached hereto as **Exhibit A** (the "Revised Proposed Order"), and asked whether the Trustee would be agreeable to submitting the Revised Proposed Order.

25. The same day ARKK reached out to counsel for Pitman Farms to express its concerns regarding the potential recognition of liens and distribution of proceeds under the Sale Order. Pitman relayed that it had no objection to ARKK's Revised Proposed Order.

26. On July 7, 2021, ARKK spoke with counsel to Farmer Mac. Farmer Mac opposed ARKK's requested revisions and proposed alternative language that would (i) bind the Trustee, debtor, all creditors, and all other parties-in-interest to the terms of the order, (ii) allow a 30 day period for parties-in-interest (but not the Trustee) to file an objection to Farmer Mac or Pitman

Farm's claims, and (iii) allow their claims in the full amount and recognize the validity of asserted liens if no objection to such claims is made within 30 days. While ARRK is not opposed to a reasonable deadline, in excess of 30 days, to object to claims, the proposed language bars the Trustee from contesting claims, which may impair the ability to object to claims on the basis of voidable transfers or preferences.

27. On July 9, 2021, ARKK spoke with the Trustee via teleconference. The Trustee was receptive to ARKK's concerns and expressed that he did not have an issue with ARRK's Revised Proposed Order. He acknowledged that he was uncertain about whether the proposed sale would cause the estate to incur liability in connection with the New Market Tax Credits, and, if that were the case, he would be hesitant to go forward with the sale. He expressed he would continue to investigate the concerns raised by ARKK in advance of the hearing on the Sale Motion.

## ARGUMENT

### I. SERIOUS CONCERNS EXIST AS TO WHETHER THE SALE MOTION BENEFITS THE ESTATE

28. The Sale Motion represents a pivotal moment in this case. As mentioned above, the Assets represent approximately 95% of the value of all listed assets of the estate. While the same schedules list the value of these assets at ~$27.5 million, the Accepted Bid totals only $9.5 million, or approximately 1/3 of the listed value, with the sale proceeds proposed to go to one creditor and one insider.

29. Given the discrepancy between the listed value on the schedules, which were signed under penalty of perjury, and the Accepted Bid, serious questions exist as to whether the process undertaken to-date, and the process going forward, obtains fair market value for the assets and is in the best interests of creditors. It is not even clear if the assets were properly marketed to achieve

the highest and best result. *See In re VCR I, LLC*, No. 12-02009-NPO, 2019 Bankr. LEXIS 3376, at *28 (Bankr. S.D. Miss. Oct. 28, 2019) (The trustee has the duty to maximize the value of the estate through not just the sale but also the sale process.) (citing *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 352 (1985)). Critically, the Sale Motion is not supported by any declaration. The Sale Motion should be resubmitted to supplement the record and provide necessary information for the Court to evaluate whether to approve the Sale Motion, including: What was the marketing process undertaken to receive the initial bids? Did the broker perform an initial valuation of the assets? What other bids were received and how were they valued?[4] Why were these bids rejected in favor of the Accepted Bids? What will be the marketing process in connection with the auction? Have these other bidders been notified of the auction? Did the Trustee and broker consider different permutations of assets to package together to increase the overall value coming back to the estate?

30. Of the questions a revised Sale Motion should answer, the most significant question relates to the New Market Tax Credits. As discussed above, the Debtor alerted the Court that it had obtained approximately $31 million in New Market Tax Credits in connection with its then-purchase of the poultry production and processing facilities which are now proposed to be sold under the Sale Motion. While the Debtor represented to the Court that it was negotiating with its lenders whether it can avoid some or all of its obligation to repay these credits in the event the poultry production and processing facility is no longer owned or operated by SE, the status of those negotiations—to ARKK's knowledge—have not been made known to the Court. If the sale can be conducted in a manner to eliminate or mitigate the Debtor's liability on the credits, this would

---

[4] The Sale Motion states "multiple bids were received by Heritage for the property as a whole and as a so-called "turnkey" operation." ¶ 12.

become the paramount factor in determining whether the packaging of the assets maximizes their value and whether a bid that is received is highest and best. To the extent tax liability is implicated by the sale, an opinion of tax counsel should be furnished prior to determination of a winning bid so that parties-in-interest can evaluate whether such bid is truly highest and best.

## II. THE SALE MOTION AND PROPOSED ORDER INAPPROPRIATELY PREJUDICE THE RIGHTS OF PARTIES-IN-INTEREST

### A. The Sale Motion Could Be Interpreted as Settling Claims Against the Estate

31. The Sale Motion and order should be clarified to ensure it does not settle substantial claims against the estate without providing parties-in-interest the opportunity to evaluate the claims and assess the reasonableness of the settlement.

32. Paragraph 19 of the Sale Motion provides: "The order approving this Motion should provide that any and all liens, claims, titles, encumbrances, interests, and rights asserted by Farmer Mac and Pitman Farms will attach to the gross proceeds from the highest and best court-approved sale, in whatever order of priority that existed as of the commencement of this case."

33. Paragraph 20 of the Sale Motion provides: "More specifically, with respect to the Assets, because no one disputes that the Debtor owns the Real Estate in fee simple absolute, and the Personal Property absolutely, subject only to Farmer Mac's mortgage and security interest and Pitman Farms' mortgage, and since both are consenting to the sale free and clear of their liens, the Trustee seeks permission from this Court to effectuate the sale pursuant to 11 U.S.C. §363(f)(2)."

34. The two paragraphs above could be interpreted to mean that no party disputes the validity of Farmer Mac's and Pitman Farms' asserted security interests in the Assets and that such security interests will attach to the sales proceeds pursuant to the sale order.

35. The Motion, however, goes on to state that "If a dispute arises as the validity of the mortgage liens of either Farmer Mac or Pitman Farms, and/or the security interest of Farmer Mac in the Personal Property, the Trustee alternatively seeks permission from this Court to sell the Real Estate and Personal Property pursuant to 11 U.S.C. §363(f)(4)." Sale Motion ¶ 21. On this basis, ARKK does not believe it was the Trustee's intention to recognize the validity and priority of Farmer Mac's and Pitman Farm' asserted liens through the Sale Motion, but merely to provide that if their claims are later allowed against the estate and/or their security interests are found to be valid and perfected, such interests would, at that stage, attach to the proceeds of the Sale. It is ARKK's understanding that, in its conversation with the Trustee, the Trustee confirmed the clarifying language in ARKK's Revised Proposed Order is consistent with his intention.

36. ARKK's Revised Proposed Order clarifies that the order does not recognize the validity or priority of any parties' security interests, that the Trustee's and parties-in-interest's right to object to claims is not prejudiced, and that, if Farmer Mac's and/or Pitman Farms' security interests are later found to be valid and perfected, they will attach to the sale proceeds in accordance with the validity and priority of their liens on the Assets. Pitman Farm's did not object to the Revised Proposed Order, and it is ARKK's understanding that the Trustee also had no issue with accepting these changes.

37. Farmer Mac, however, opposed ARKK's Revised Proposed Order. This opposition indicates that, absent clarifying language, this Court and parties-in-interests may incur needless litigation over whether the Order recognized the validity of Farmer Mac's and/or Pitman Farms' asserted security interests.

38. To the extent the Sale Motion and Proposed Order contain language that recognizes the validity of Farmer Mac's and Pitman Farms' asserted security interests and/or purports to allow

their claims against the estate, the Sale Motion should be denied. A sale pursuant to section 363 is not the appropriate vehicle to settle claims against the estate. Instead, the trustee should be required to move under Bankruptcy Rule 9019.[5] This procedure would give proper notice to parties-in-interest that the estate seeks to settle claims, at which time parties-in-interest and the Court would be able to evaluate the reasonableness of the settlement.[6]

      **B.**    **The Court Should Not Permit the Sale Motion to Be Structured as a *Sub Rosa* Plan**

39. In addition to potentially allowing purported secured claims against the estate, the Sale Motion could be interpreted to predetermine that the proceeds of the sale will be distributed solely to Farmer Mac and Pitman Farms in accordance with an agreement between those two parties.

40. Paragraph 10 of the Sale Motion states "The Trustee is credibly informed that Farmer Mac and Pitman Farms have agreed between themselves as to a division of the gross sales proceeds whereby Farmer Mac shall be entitled to receive 96% of the gross sales price and Pitman Farms shall be entitled to receive 4% of the gross sales price, in each instance to be reduced by a pro rata share of the sale expenses described in Paragraph 17[7] of this Motion."

---

[5] Bankruptcy Rule 9019 provides: "(a) Compromise. On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct."

[6] Under Supreme Court jurisprudence, a settlement would not be approved by the court absent "informed and independent judgment as to whether a proposed compromise is fair and equitable" which requires that: "the bankruptcy judge has apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the compromised claim be litigated. Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation." *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry v. Anderson*, 390 U.S. 414, 424, 88 S. Ct. 1157, 1163 (1968).

[7] ARKK believes the Trustee intended to reference paragraph 19, not paragraph 17.

41. To the extent the Sale Motion recognizes claims without giving parties-in-interest the opportunity to object to those claims, and then distributes substantially all value currently in the estate to those two claimholders, in accordance with a private agreement between those parties rather than in accordance with parties' rights under the Bankruptcy Code, it is an impermissible *sub rosa* plan.[8]

42. For example, in *In re Flight Transp. Corp. Securities Litig.*, 730 F.2d 1128, 1135 (8th Cir. 1984), the Eighth Circuit found that a settlement agreement was not a *sub rosa* plan like that in *Braniff* because "unlike the *Braniff* agreement does not dictate the terms of any future reorganization plan, since the assets of the bankruptcy estate will be distributed in the normal course of the bankruptcy proceeding; it does not require any claimant to vote in favor of any future reorganization plan; and the only release of claims involved is the class plaintiffs' release of their own claims against FTC's estate."

43. Here, by contrast, the Sale Motion not only pre-determines the distribution of the sale proceeds between certain asserted secured claimholders, but also would leave virtually no value left in the estate to distribute to parties-in-interest. These parties-in-interest would have no ability to object to the claims of Farmer Mac and Pitman Farms, as the validity and priority of their liens would (potentially) have been recognized. To the extent the Sale Motion also saddled the estate with an additional $31 million liability, there would be little incentive for parties-in-interest

---

[8] *See, e.g., In re Braniff Airways, Inc.,* 700 F.2d 935, 940 (C.A.5 1983) (prohibiting an attempt to "short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* in connection with a sale of assets"); *In re Lionel Corp.,* 722 F.2d 1063, 1069 (C.A.2 1983) (reversing a Bankruptcy Court's approval of an asset sale after holding that § 363 does not "gran[t] the bankruptcy judge *carte blanche* " or "swallo[w] up Chapter 11's safeguards"); *In re Biolitec, Inc.,* 528 B.R. 261, 269 (Bkrtcy.Ct.N.J.2014) (rejecting a structured dismissal because it "seeks to alter parties' rights without their consent and lacks many of the Code's most important safeguards"); cf. *In re Chrysler LLC,* 576 F.3d 108, 118 (C.A.2 2009) (approving a § 363 asset sale because the bankruptcy court demonstrated "proper solicitude for the priority between creditors and deemed it essential that the [s]ale in no way upset that priority"), vacated as moot, 592 F.3d 370 (C.A.2 2010) (*per curiam* ).

and the Trustee to investigate whether to pursue fraudulent transfer and preference actions to bring value back into the estate because any distributions to creditors would be massively diluted by the tax liability. In other words, there would be little left for the Trustee to do then close the case.

44. The Court should, instead, follow the example of the court in *In re S. Star Foods, Inc.*, 190 B.R. 419, 421 (Bankr. E.D. Okla. 1995). There, the court had entered an order on an emergency basis allowing the sale of an involuntary chapter 7 debtor's assets. All alleged secured and tax creditors of the debtor were subsequently paid from the sale proceeds. *Id.* After a chapter 7 trustee was appointed, the trustee sued the various creditors in the belief that such payments were unauthorized transfers which were avoidable, recoverable, and subject to subordination. *Id.* at 422. The creditors defended the action by arguing that the court implicitly authorized the distribution of sales proceeds based on statements of counsel and agreement among those parties in interest as to how the proceeds should be distributed. The court rejected this argument, finding it implausible that the sale order would "effectively to determine the validity and priority of each and all of those dozen claims, *as they appeared under nonbankruptcy law,* waiving the bankruptcy estate's interest therein and frustrating the priority and distribution scheme of the Bankruptcy Code, immediately before allowing the debtor to confess involuntary bankruptcy and proceed under that very Code whose provisions had just been frustrated." *Id.* Instead, the court held that "it is far more plausible that [the order] would, at such an emergency hearing on an imminent sale, merely authorize the sale to take place, reserving for a later time the question of how the sale proceeds should and would be distributed." *Id.*

45. For substantially the same reasons, the Sale Motion and Proposed Order should be clarified to preserve the Trustee's all parties-in-interest's rights to object to claims and should not predetermine the distribution of the proceeds unless and until all parties in interest had the

- 14 -

opportunity to object to the alleged secured claims filed by Farmer Mac and Pitman Farms against the estate.[9]  Any proposed order should make clear that any parties in interest can object to Farmer Mac's and Pitman Farms' claims and the order does not foreclose such objection or determine the distribution prior conformation of a plan.

WHEREFORE, ARKK respectfully requests this Court deny the Sale Motion without prejudice to the Trustee presenting a sale that maximizes the value of the Assets, provides sufficient clarity and factual submissions to enable parties-in-interest to evaluate whether the sale accomplishes this objective, does not unduly result in the incurrence of liability on the New Market Tax Credits, and such other relief as may be just and proper under the circumstances.  In the alternative, the Court should only approve the Motion subject to the Proposed Order incorporating the revisions in the Revised Proposed Order.

/s/ Kristina M. Stanger
Kristina M. Stanger, ID # AT000255
NYEMASTER, GOODE, P.C.
700 Walnut Street, Suite 1600
Des Moines, Iowa  50309-3899
Telephone:  (515) 283-8009
Fax:  (515) 283-8045
Email:  kms@nyemaster.com

AND

/s/ Todd J. Ohms
Todd J. Ohlms*
PROSKAUER ROSE LLP
70 West Madison, Suite 3800
Chicago, IL 60602
Tel: 312-962-3537
tohlms@proskauer.com

-and-

---

[9] 11 U.S.C. § 502(a): "A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, **unless a party in interest** … objects." (emphasis added).

        */s/ Daniel S. Desatnik*
        Daniel S. Desatnik*
        PROSKAUER ROSE LLP
        Eleven Times Square
        New York, NY 10036
        Tel: 212-969-3000
        ddesatnik@proskauer.com

        ATTORNEYS FOR ARKK FOOD COMPANY, INC.
        *\*Pro Hac Vice*

## Certificate of Service

The undersigned certifies, under penalty of perjury, that on this 12th day of July, 2021, the foregoing document was electronically filed with the Clerk of Court using the Northern District of Iowa CM/ECF and the document was served electronically through the CM/ECF system to the parties of this case

<u>/s/ <i>Meagan Breckenridge</i></u>