## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| IN RE:<br><br>SIMPLY ESSENTIALS, LLC,<br><br>        Debtor. | Chapter 7<br>Case No. 20-00305<br><br>**TRUSTEE'S MOTION FOR AN ORDER AUTHORIZING AND APPROVING (A) COMPROMISE AND SETTLEMENT WITH ARKK FOOD COMPANY, AND (B) SALE OF CERTAIN ESTATE CAUSES OF ACTION FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES** |

COMES NOW Larry S. Eide in his capacity as Trustee in this Chapter 7 case ("Trustee"), respectfully submits this motion (the "Motion") pursuant to sections 105(a), 502(b), and 363 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 6004, 9008, 9014 and 9019(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an order substantially in the form attached hereto as **Exhibit A** (the "9019 Order"), authorizing and approving (a) the compromises and settlements ("Settlements") reached with estate creditor ARKK Food Company ("ARKK") embodied in the Claim Settlement and Sale Agreement dated as of November 2, 2021, a copy of which is attached to the 9019 Order as **Schedule 1** (as may be amended, the "Agreement") by and among the Trustee and ARKK (together, the "Settling Parties"), and (b) the sale of certain estate causes of action and proceeds thereof to ARKK free and clear of liens, claims, and encumbrances.  In support of the Motion, the Trustee states as follows:

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ................................................................................................ 1

JURISDICTION AND VENUE ............................................................................................... 5

RELEVANT BACKGROUND ................................................................................................ 5

I.   Conduct Giving Rise to the Pitman Causes of Action ........................................................ 5

   A.   Pitman Farms Purportedly Provides SE with an approximate $5 Million Secured Loan Less than Two Month Before Shutting Down SE. ........................................................ 5

   B.   Pitman Farms Uses the Loan Proceeds to Pay Itself and Other Insiders. ..................... 6

   C.   Pitman Allegedly Lends Simply Essentials an Additional approximately $95 Million. 8

II.   Pitman's Campaign to Defraud, Hinder, and Delay Creditors ........................................... 9

   A.   Pitman Fraudulently Transfers In Excess of $32 Million in Simply Essentials' Chicken to Pitman Subsidiaries. ........................................................................................... 9

   B.   Pitman Begins Stripping Simply Essentials of Assets ................................................ 10

III.   The Involuntary Petition and Sale Motion .................................................................... 10

   C.   The Sale Motion ....................................................................................................... 11

   D.   The Renewed Sale Motion ........................................................................................ 12

IV.   FARMER MAC AND PITMAN FARMS MOVE TO LIFT THE STAY .................... 12

V.   ARKK'S CLAIM AND PITMAN FARMS' CLAIM OBJECTION ............................ 13

VI.   THE CLAIM SETTLEMENT AND SALE AGREEMENT ........................................ 14

RELIEF REQUESTED ........................................................................................................... 16

BASIS FOR RELIEF .............................................................................................................. 16

I.   ARKK's Probability of Success on its Claim Weighs in Favor of Settlement. ................. 18

II.   The Complexity and Inconvenience in Litigating ARKK's Claim also Weigh in Favor of Settlement. ........................................................................................................................ 19

III.   The Agreement and Settlements are in the Paramount Interests of Creditors. .............. 20

IV.   The Sale of the Pitman Causes of Action to ARKK is an Exercise of the Trustee's Business Judgment and Maximizes the Value of the Estate's Assets. ................................... 22

CONCLUSION ........................................................................................................................ 24

## PRELIMINARY STATEMENT

1.     Overview of the Settlements.  The Motion requests approval of Settlements that have the dual benefit of eliminating the largest non-insider claim against the Estate while representing the best prospect of providing meaningful recoveries to non-insider unsecured claimholders.  Pursuant to the Agreement, ARKK agrees to withdraw its approximately $23.4 million claim against the Estate[1] and to affirmatively support the Sale Motion filed by the Trustee by withdrawing its pending objection and reservation of rights.  In exchange, the Trustee agrees to transfer to ARKK, free and clear, a limited subset of causes of action the Estate owns against Pitman Farms and other Insiders.  ARKK shall assume all risks associated with the prosecution of these "Pitman Causes of Action", in that ARKK will be solely responsible for payment of all Fees and Expenses, including attorneys' fees, and ARKK waives its ability to seek compensation for these expenses on an administrative expense basis from the Estate.  Any Proceeds of the Pitman Causes of Action that ARKK is able to obtain shall, with one exception, be first used to pay ARKK's Fees and Expenses.  The Net Proceeds will then be split 85% and 15% between ARKK and the Estate respectively.  In this way, the Estate achieves immediate value from the withdrawal of ARKK's Claim and its opposition to the Sale Motion, faces no expenses or downside risk from prosecution of the Pitman Causes of Action and, as explained below, enjoys a split of the upside in valuable actions to be brought by ARKK as representative of the Estate against Pitman and other Insiders.

2.     Significance of the Settlements.  As it currently stands, non-insider unsecured claimholders will receive *de minimis* recoveries on account of their claims.  The Trustee accepted

---

[1]      Capitalized terms used but not otherwise defined shall have the meanings set forth in the Agreement.

an offer of $9.5 million for substantially all tangible assets of the Estate which was followed by an auction bid of $9.5 million (this auction bid was subsequently withdrawn) as compared to asserted secured claims of approximately $20 million (including Pitman Farms' asserted secured claim of $5 million). The Trustee still anticipates a sale of such assets for $9.5 million, however the Estate is to receive only 0.75% of the gross sales proceeds in the event such sale is consummated. Should the Estate fail to complete a sale of those assets by December 1, 2021, the Court has entered stay relief orders permitting the purported secured creditors—Farmer Mac and Pitman Farms—to pursue *in rem* actions against the property. Those stay relief motions were predicated on the contention the Estate lacks any equity in the assets. While the stay relief orders preserve the ability of parties-in-interest to object to Farmer Mac and Pitman's secured claim, absent success on those claim objections, unsecured creditors should not anticipate any residuals from any sale of such assets.

3.      To the extent the Estate has cash accounts and receives proceeds from the sale of unencumbered assets, these modest sums would be divided *pro rata* amongst priority and unsecured claimholders, respectively. The Debtor's Schedules list approximately $150 million in unsecured claims, with approximately $50 million in non-insider unsecured claims being significantly diluted by the $100 million in unsecured claims by Pitman Farms, which are listed as "undisputed" on the Debtor's Schedules. Thus, two-thirds of any unsecured creditor recoveries would go to Insiders.

4.      Over a year has passed since an Order for Relief was entered in this case, and yet, creditors are still left to wonder why a once-successful processor and seller of premium chicken products was thrust into Chapter 7 liquidation and is purportedly so insolvent that it has assets of $9.5 million against liabilities exceeding $150 million. This situation is made more confounding

by the fact that the Debtor's Schedules assert that the Debtor received over $125 million in loans (many of which were made mere months before the Debtor closed its operations), yet that money (not to mention untold tens of millions in equity infusions) somehow managed to simply evaporate; there are no large sums sitting in cash accounts, and, as already mentioned, the value of the remaining assets is but a fraction of a fraction of these amounts.

5.      The Settlements, if approved, provide the best prospect of reversing this bleak situation for non-insider unsecured creditors, shedding light on the misdeeds leading to the Debtor's distress, and driving meaningful recoveries to these claimants.  This would be achieved by (i) the withdrawal of ARKK's Claim of approximately $23.4 million, (ii) the Estate Proceeds obtained in connection with ARKK's prosecution of the Pitman Causes of Action, and (iii) following such prosecution, the possible disallowance or equitable subordination of Pitman Farms' approximately $100 million in unsecured claims and $5 million in secured claims.

6.      <u>The Pitman Causes of Action</u>. Causes of action that the Estate holds against third parties are property of the Estate pursuant to Bankruptcy Code section 541.  Through this Motion, and as part of the Settlement with ARKK, the Estate seeks approval to sell free and clear a limited subset of the Estate's causes of action to ARKK—the Pitman Causes of Action—in exchange for, among other things, (i) the withdrawal of its ARKK's Claim, (ii) ARKK's commitment to assume the financing of the prosecution of the Pitman Causes of Action, and (iii) 15% of the Net Proceeds of the actions.  The Pitman Causes of Action are comprised of any and all Causes of Action, including Avoidance Actions, that the Estate holds against Pitman Farms and other Insiders.

7.      ARKK has obtained, and the Trustee has reviewed, the *Declaration of Todd Henning*, a copy of which is attached as Exhibit C to the Agreement.  Todd Henning was the co-founder and Chief Operating Officer of Simply Essentials, LLC ("SE").  The Henning Declaration

3

states that after Pitman Farms acquired SE, Pitman sought to undermine SE's contractual obligations to pay (i) SE's former parent, Tillridge, a portion of its EBITDA as part of an "earn-out" arrangement, and (ii) ARKK a commission on all of SE's sales, whether procured by ARKK or not.  To reduce and eventually eliminate these payments, the Henning Declaration states that Pitman used its position of control over the Debtor to divert approximately 40,000 pounds of poultry harvested at the SE factory per week to other Pitman-owned subsidiaries, including Mary's Chickens located in California.  These chickens would then be sold under the Mary's Chickens label to the same clients who were supposed to be receiving Simply Essentials' chicken.  The sales from the diverted chicken would be accounted for as output of Mary's Chickens rather than Simply Essentials.  This diversion drastically reduced SE's sales and revenues (and ultimately EBITDA), and thus enabled SE to reduce the revenues attributable to Tillridge's earn-out and the sales commissions owed to ARKK.  Mr. Henning estimates, based on his review of SE's data collection program, that approximately $32 million in revenue was diverted by Pitman from SE to Mary's Chickens or other Pitman-owned subsidiaries in this manner.

8.      Following approval of the Motion, and on the basis of the Henning Declaration, ARKK intends to bring a complaint against Pitman Farms and other Insiders for, among other things, actual intent and constructive fraudulent transfers in order to recover the value of improperly and/or fraudulently diverted property.  ARKK would further determine whether these actions give rise to breach of fiduciary duty claims, and equitable subordination of Pitman Farms' claims.  Moreover, as detailed below, ARKK has also thoroughly reviewed Pitman Farms' proofs of claim and the Debtor's Schedules and believes viable causes of action for preferential transfer and fraudulent transfer exist against Pitman and its affiliates arising from these purported transactions.

9.      The Trustee has determined that the Estate lacks sufficient resources to pursue the Pitman Causes of Action and that he might have to abandon the claims. Accordingly, ARKK's agreement to prosecute the Pitman Causes of Action, assume full responsibility for all Fees and Expenses incurred therewith, and provide the Estate with the Estate Proceeds is beneficial to the Estate and maximizes the value of Estate assets for the benefit of creditors. For these reasons, and the reasons set forth below, the Trustee's decision to enter into the Settlements surpasses the lowest point in the range of reasonableness required for approval under Bankruptcy Rule 9019 and after notice, the Trustee seeks the Court's approval in form of an Order as attached Exhibit A.

## JURISDICTION AND VENUE

1.      The Court has subject matter jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.

2.      This is a core proceeding under 28 U.S.C. § 157(b).

3.      Venue of this case and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

4.      The statutory predicates for relief are Bankruptcy Code §§ 105(a), 502(b), and 363 and Bankruptcy Rules 2002, 6004, 9008, 9014 and 9019(a).

## RELEVANT BACKGROUND

**I.      CONDUCT GIVING RISE TO THE PITMAN CAUSES OF ACTION**

**A.  Pitman Farms Purportedly Provides SE with an approximate $5 Million Secured Loan Less than Two Month Before Shutting Down SE.**

10.      Pitman Farms is the sole-member and manager of Simply Essentials, holding 100% of its interests. *See* Schedules A/B, D, E/F, G, H. (Dkt. # 80) (the "Debtor's Schedules") at 45.

11.      According to Pitman Farms' proof of claim (Proof of Claim #2), Pitman Farms entered into a Loan Agreement with Simply Essentials on June 2, 2019 for "a certain loan in the

principal amount not to exceed at any date outstanding of $5,000,000" (the "Purported Secured Loan"). Claim #2-1 at 8 ("Proof of Claim"). The Proof of Claim asserts $4,913,277.91 in principal and $33,221.47 in interest due on the Purported Secured Loan. *Id.* at 5.

12.     The Purported Secured Loan was signed by Richard Pitman and David Pitman on behalf of Pitman Farms as "Lender", and by Richard Pitman and David Pitman on behalf of Simply Essentials as "Borrower". *Id.* at 11. No fairness opinion or evidence of approval by an independent board concerning the Purported Secured Loan has been entered into the record.

13.     Despite having full control over the Debtor and having full access to its records, Pitman Farms provides no evidence in its Proof of Claim that the Purported Secured Loan proceeds were actually disbursed to the Debtor, or how those funds were used and to where they disappeared.

**B. Pitman Farms Uses the Loan Proceeds to Pay Itself and Other Insiders.**

14.     Less than 2 months after the $4.9 million Purported Secured Loan was made, "Pitman Farms maintains that Debtor closed its Iowa plant circa August 2019 and ceased business operations at or soon after that time." *See* Dkt. # 162 at 3 n.5.

15.     Having ceased operations, and with purportedly over $150 million in debt, Simply Essentials was insolvent no later than August 2019,[2] as it had no ability to pay its debts as they became due.

16.     Thus, Pitman Farms' Purported Secured Loan was an attempt to give Pitman Farms a secured position on all SE assets, with priority over all of SE's unsecured creditors, in what Pitman Farms knew was an insolvent entity likely headed to bankruptcy.

---

[2]     Simply Essentials was likely insolvent prior to this date. Further discovery is needed to determine when Simply Essentials became unable to pay its non-insider debts as they came due.

17.     Moreover, it can be inferred that some or all of the proceeds of the Purported Secured Loan, if actually disbursed to SE, were used to pay Pitman Farms and other Insiders.

18.     Page 40 of the Debtor's Schedules lists $6,064,371.27 in transfers made to Pitman Farms and Pitman-affiliates within two years before the Involuntary Petition.

19.     Numerous large payments to these Insiders occurred after the Purported Secured Loan was made.  *See* Debtor's Schedules at 48-52.  For example, $3,470.84 was paid to Ben Pitman on November 4, 2019, two months after SE ceased operations.  In addition, Pitman Farms' entities were paid at least the following sums, totaling approximately $1.38 million[3]:

| Pitman Family Farms | 7/09/19 | $29,856.60 |
|---|---|---|
| Pitman Farms Inc | 7/09/19 | $316,482.54 |
| Pitman Farms Inc | 7/09/19 | $103,241.85 |
| Pitman Farms Inc | 7/31/19 | $556,091.38 |
| Pitman Farms-UTAH | 7/09/19 | $66,720.93 |
| Pitman Farms-UTAH | 7/09/19 | $12,017.39 |
| Western Grain & Milling | 7/31/19 | $160,442.42 |
| Western Grain & Milling | 2/4/2020 | $23,000.00 |
| Western Grain & Milling | 72/4/2020 | $120,000.00 |

20.     Thus, the proceeds of Pitman Farms' Purported Secured Loan made a "round trip" back to Pitman Farms and other Insiders, with Pitman Farms receiving both preferential payments and a secured position in the assets of the Debtor.

---

[3]     Other substantial payments to Pitman Farms' entities are listed as having been paid but "voided" and are therefore not listed above.

21.     The Trustee understands that ARKK intends to investigate whether the Purported Secured Loan was ever actually made by Pitman Farms to SE, how the proceeds were used, whether any proceeds disbursed to Insiders can be clawed back into the Estate, and to seek avoidance of Pitman Farm's purported secured claim or recharacterization of the claim as a capital contribution.

**C. Pitman Allegedly Lends Simply Essentials an Additional approximately $95 Million.**

22.     The Debtor's Schedules (at 25) list a $94,857,694.71 claim by Pitman Farms for "Loans/Advances/Guarantees" it purportedly made to the Debtor.  It separately lists an additional $800,055.60 as "Advances." (collectively, the "Purported Unsecured Loans", and together with the Purported Secured Loan, the "Purported Loans").

23.     Unlike numerous other scheduled debts, the Debtor's Schedules do not list this enormous sum of Pitman claims as "disputed," or the supposed guarantees as "contingent."

24.     No further documents or descriptions have been provided by the Debtor or Pitman to support such a massive claim, which alone represents almost two-thirds of total claims against the Estate.  Nor has any disclosure been made as to when the loans were made, why they were made, and how the proceeds of the loans (if actually disbursed by Pitman) were used.  Nor is there any disclosure as to what portion of the Purported Unsecured Claims are comprised of "Loans" vs. "Advances" vs. "Guarantees."

25.     Through its pursuit of the Pitman Causes of Action, the Trustee understands that ARKK intends to investigate whether $95 million in Purported Unsecured Loans was ever infused into the Debtor's business, and, if so, where the value dissipated to, whether such value can be recovered for the benefit of the Estate, and whether such loans should be recharacterized as capital contributions and/or equitably subordinated.

## II.      PITMAN'S CAMPAIGN TO DEFRAUD, HINDER, AND DELAY CREDITORS

### A. Pitman Fraudulently Transfers in Excess of $32 Million in Simply Essentials' Chicken to Pitman Subsidiaries.

26.      As mentioned above, ARKK has obtained and shared with the Trustee the Henning Declaration.

27.      As relevant here, Mr. Henning attests that, following Pitman Farms' acquisition of SE, he began to notice "serious discrepancies in SE's records between the number of chickens the Plant was receiving and the amount of product sold that was attributed to the SE."  Henning Decl. ¶ 28.  Mr. Henning determined that "[t]he discrepancy was the result of the regular process of poultry, originating from SE's work at the Plant, being diverted to Pitman's other business, Mary's Chicken, located in California for harvesting and ultimate sale under the Mary's Chicken label [a Pitman subsidiary].  The diverted poultry, rather than being properly accounted for as part of SE's Plant's output, was being accounted for as the output of Mary's Chicken.  The SE chicken, which was being sold instead under the Mary's Chicken label, was being sold to the same clients who were supposed to be receiving the SE chicken." *Id.* ¶ 30.

28.      According to Mr. Henning, this diversion "dramatically reduced SE's sales and revenues (and ultimately EBITA), and thus enabled SE to reduce the revenues attributable to [SE's former owner's] earn-out under the purchase agreement and the sales commissions owed to ARKK under the MBA." *Id.* ¶ 30.

29.      Mr. Henning estimates that approximately $32 million in product was diverted in this fashion, comprising of, on average, 5 to 7 truckloads of harvested poultry per week…weighing approximately 40,000 pounds." *Id.* ¶ 31.

30.      Notably, Mr. Henning states that "SE received no value in exchange for the diverted chicken." *Id.* ¶ 29.

**B.  Pitman Begins Stripping Simply Essentials of Assets.**

31.      One month after Pitman Farms made its Purported Secured Loan of $4.9 million to SE, and only one month before shutting SE down, Pitman Farms began actively stripping assets from SE for its own benefit.

32.      As shown on page 80 of the Debtor's Schedules, from July 3, 2019 to September 1, 2019, when SE was unquestionably insolvent, Pitman Farms directed the Debtor to sell to Pitman Farms dozens of vehicles in exchange for approximately $1.8 million, "Machinery/Equipment/Misc" for $4.2 million, and approximately $645,923 in "Live Inventory."

33.      There is no disclosure or other information provided to establish whether the prices Pitman Farms paid for these assets were fair.

34.      There is further no disclosure and no way of knowing whether Pitman Farms' piece-meal stripping of these assets greatly reduced the value of the remaining assets of the Debtor.

35.      The Trustee understands that ARKK intends to investigate Pitman Farms' self-dealing transactions and determine whether the value of the assets can be clawed back for the benefit of the Estate.

## III.    THE INVOLUNTARY PETITION AND SALE MOTION

36.      On March 6, 2020, certain creditors of SE filed the involuntary bankruptcy petition against SE.

37.      On August 7, 2020, SE filed its *Motion to Dismiss the Involuntary Bankruptcy Case and Memorandum in Support of Motion to Dismiss* (Dkt Nos 31 and 32).

38.      On August 10, 2020, SE filed its voluntary Chapter 11 bankruptcy in the United States Bankruptcy Court for the Eastern District of Iowa, Fresno Division as Case No. 20-12633.

39.      On August 17, 2020, certain creditors filed their *Motion for Transfer of Venue of California Bankruptcy to the Bankruptcy Court for the Northern District of Iowa* (Dkt. # 38, the

"Transfer Motion") seeking to transfer the Voluntary Case filed in the California Court to this Court.

40.     On September 18, 2020, SE withdrew its motion to dismiss and consented to entry of an order for relief pursuant to the involuntary chapter 7 petition. (Dkt. # 71).

41.     On September 22, 2020, Larry S. Eide was appointed as Trustee. (Dkt. # 74).

42.     On September 30, 2020, the Debtor filed its original Schedules A/B, D, E/F, G, valuing the processing plant at $4 million, the parking lot and live shed at $500,000, and its machinery and equipment at approximately $23 million (collectively, the "Assets"), for a combined value of approximately $27.5 million.

43.     On March 4, 2021, the Debtor filed amended schedules D (Dkt. # 89) and E/F (Dkt. # 88).  In the Schedule E/F, Pitman's $4,915,000 claim was listed as secured by the rolling stock and all machinery and equipment.  Farmer Mac's approximate $13 million claim was listed as secured by the processing plant and machinery and equipment.

44.     In its amended Schedules, the Debtor valued its total assets at approximately $29.5 million and its total liabilities at approximately $150 million, consisting of $18.131 million in secured claims and $132.207 million in unsecured claims.

**C. The Sale Motion**

45.     On June 22, 2021, the Trustee filed the Sale Motion, seeking to sell substantially all assets of the Debtor, including the processing plant, remaining machinery and equipment, the parking lot and live shed.  (Dkt. # 119).

46.     Collectively, the Assets represent approximately 95% of the value of all listed assets of the estate.

47.     While the Debtor's Schedules list the value of these assets at approximately $27.5 million, the proposed accepted bid under the Sale Motion (and its subsequent Renewed Sale Motion) totaled only $9.5 million, or approximately 1/3 of the listed value.

48.     ARKK, in an objection to the Sale Motion (Dkt. # 128), questioned "the discrepancy between the listed value on the schedules, which were signed under penalty of perjury, and the Accepted Bid."  ARKK's objection has not been withdrawn.

**D.  The Renewed Sale Motion**

49.     On August 11, 2021, an auction for the Assets was held.

50.     The only Qualified Bidder present at the auction was International Poultry Breeders, L.L.C. d/b/a/ The Best Dressed Chicken ("BDC").  BDC made a bid of $9.5 million which was accepted by the Trustee.

51.     On August 13, 2021, the Trustee submitted a Renewed Sale Motion (Dkt. # 149) seeking to sell the Assets to BDC for $9.5 million.  ARKK renewed its concerns in its Reservation of Rights filing (Dkt. # 156).

52.     While an evidentiary hearing was scheduled for September 28, 2021, that hearing has been subsequently continued (Dkt. # 175), because BDC withdrew its offer.

**IV.     FARMER MAC AND PITMAN FARMS MOVE TO LIFT THE STAY**

53.     On September 24, 2021, Farmer Mac filed its *Motion for Relief from the Automatic Stay* (Dkt. # 172), asserting its security interest in the Assets and arguing that stay relief is appropriate under because the "Debtor does not have equity in the Collateral" since the highest bid to purchase the Assets was $9.5 million.

54.     On September 27, 2021, Pitman Farms its *Motion to Lift Stay* (Dkt. # 177), asserting its secured interest on account of its Purported Secured Loan in the Assets, as well as a parking lot

and live shed, and similarly arguing that stay relief is appropriate under Bankruptcy Code section 362(d)(2) because the Debtor lacked equity in the Assets.

55.     On October 8, 2021, the Trustee (Dkt. # 190) and ARKK (Dkt. Nos. 192, 193) filed objections to the Farmer Mac and Pitman Farms lift stay motions.  Subsequently, the Trustee also received a renewed purchase agreement from Pure Prairie, the original proposed buyer.

56.     On October 15, 2021, on consent, the Court entered orders (Dkt. Nos. 198, 200) lifting the stay effective on December 1, 2021 to permit Farmer Mac and Pitman Farms to pursue *in rem* remedies should the assets not be sold in advance of that date.  The orders were expressly without prejudice to the Trustee or ARKK pursing any objection relative to the asserted secured claims of Pitman Farms and Farmer Mac.

## V.     ARKK'S CLAIM AND PITMAN FARMS' CLAIM OBJECTION

57.     On February 10, 2021, ARKK filed its Proof of Claim as Claim No. 28, seeking damages under a certain Master Broker Agreement ("MBA").

58.     On April 27, 2021, Pitman Farms filed an Objection to ARKK's Proof of Claim.

59.     On June 21, 2021, ARKK filed its Amended Proof of Claim No. 28 for $23,388,251.79, inclusive of unpaid commissions and expectation damages arising from breach of the MBA. (the "Claim").

60.     On September 13, 2021, Pitman Farms filed a motion for partial summary judgment (together with supporting documents, the "Partial Summary Judgement Motion") seeking to reduce ARKK's Claim by the amount of commission payments ARKK alleged it reasonably expected if SE had continued to perform the MBA after September 2020.

61.     On October 4, 2021, ARKK filed an objection to the Partial Summary Judgment (together with supporting documents, the "ARKK Objection to MSJ"), arguing, *inter alia*, that Delaware law provides for expectation damages based on the non-breaching parties' reasonable

expectations at the time of contracting, and that a dispute of material fact exists as to when SE's breach of the MBA occurred.

62.     On October 12, 2021, Pitman filed a reply to the Objection (the "Reply") and, on October 22, 2021, ARKK filed a Surreply.

63.     The Trustee has reviewed ARKK's Amended Proof of Claim, Pitman Farms' objection to ARKK's Claim, the Partial Summary Judgment Motion, the ARKK Objection to MSJ, the Reply, and Surreply, and has determined that (i) the issues are complex, (ii) the claim objection has already resulted in, and likely will continue to result in, lengthy litigation and discovery, and (iii) the Estate could face significant claim liability if ARKK's Claim is meritorious and is entitled to expectation damages flowing from the MBA as a matter of law.

## VI.     THE CLAIM SETTLEMENT AND SALE AGREEMENT

64.     The Trustee and ARKK have negotiated in good faith in order to resolve the Estate's and ARKK's dispute related to ARKK's Claim.

65.     The salient terms of the Agreement reached by the Settling Parties are as follows:[4]

| ARKK's Claim | Upon entry of a final 9019 Order, ARKK shall withdraw its Claim against the Estate, and shall not file or assert any claim arising from or related to the Debtor's alleged breach of the MBA against the Estate in the pending Chapter 7 Case. ARKK shall not file any claim against the Estate on account of pre-petition conduct of the Debtor currently known by ARKK. ARKK shall not seek any distribution from the Estate on account of its Claim. |
|---|---|
| Trustee's Asset Sale | ARKK shall withdraw with prejudice its objection (Dkt. # 128) and/or reservation of rights (Dkt. # 156) to the pending sale motion (Dkt. # 149) (the "Sale Motion"), and shall agree to support and/or not take any action adverse to the Trustee's efforts |

---

[4]     Any summary of the terms of the Agreement herein is qualified in its entirety by reference to the Agreement, a copy of which is attached to the proposed 9019 Order as Schedule 1. If there are any inconsistencies between summaries in the Motion and the terms of the Agreement, the terms of the Agreement shall control. A capitalized term used in this summary shall have the meaning given it by the Agreement.

| | |
|---|---|
| | to sell the Assets (as defined in the Sale Motion), except to the extent it may interfere and/or affect in any adverse way ARKK's prosecution of the Pitman Causes of Action, as described below. |
| **Pitman Causes of Action** | In consideration for the withdrawal of ARKK's Claim and ARKK's other affirmative obligations, the Trustee agrees, in his business judgment, to transfer all causes of action held by the Debtor's Estate against any Insiders, Pitman Farms, Pitman Family Farms, David B. Pitman, Richard J. Pitman, Ben Pitman, Maren Pitman, Western Grain & Milling, and any Pitman Farms subsidiaries, officers, assigns, and affiliates, including those arising under Chapter 5 of the Bankruptcy Code, (collectively, the "Causes of Action") to ARKK. |
| | ARKK shall be the sole owner of the Pitman Causes of Action (subject to the Estate Proceeds), which shall be considered ARKK's property, shall have full control over the litigation strategy and settlement determinations, and shall have standing to appear on behalf of, and as representative of, the Estate in prosecuting the Causes of Action as if the Causes of Action had been brought by the Trustee. |
| **Fees and Expenses** | ARKK shall be solely responsible for all fees and expenses, including attorney's fees, relating to the pursuit of the Pitman Causes of Action.  ARKK shall have no ability to seek compensation, including on an administrative expense basis, from the Estate for fees and expenses incurred in connection with prosecuting the Pitman Causes of Action. |
| **Proceeds of Pitman Causes of Action** | With one exception below, the first proceeds of the Pitman Causes of Action, which shall be free and clear from any encumbrances from any other party in interest, including assertion of administrative expense claims, shall be applied to the payment of all Fees and Expenses incurred by ARKK in the prosecution of the Causes of Action. |
| | After payment in full of the Fees and Expenses, the remaining proceeds (the "Net Proceeds"), which shall be free and clear from any encumbrances, including assertion of administrative expense claims, shall be divided as follows: |
| | • 85% to ARKK ("ARKK Proceeds"); |
| | • 15% to the Debtor's Estate ("Estate Proceeds"). |
| | **Exception**: ARKK seeks to pursue avoidance of Pitman Farm's asserted secured claim (Proof of Claim #2).  To the extent Pitman |

15

| | Farms' lien is avoided or the avoidance action is settled, any proceeds obtained will be shared 85% to ARKK and 15% to the Debtor's Estate, but no proceeds will be applied from any successful claim avoidance to payment of ARKK's Fees and Expenses. |
|---|---|
| **Pending Pitman Claim Objection** | Upon entry of a final 9019 Order and ARKK's withdrawal of its Claim, the Parties agree that Pitman Farms' pending objection to ARKK's Claim (Dkt. # 95) (the "Claim Objection") shall be rendered moot.

While the 9019 Motion is pending, the Trustee shall support ARKK's effort to stay the Claim Objection, including by filing a joinder thereto. |
| **Cooperation** | The Trustee agrees, consistent with his statutory duties, to exercise reasonable efforts to cooperate with ARKK in pursuing the Pitman Causes of Action. The Trustee agrees to not oppose any action ARKK may take in pursuit of the Causes of Action, provided, however, that the Trustee may take any and all necessary actions consistent with his statutory duties under the Bankruptcy Code. |

## RELIEF REQUESTED

66.    By this Motion, the Trustee seeks entry of the proposed 9019 Order substantially in the form attached hereto as Exhibit A, that, among other things, (i) authorizes the Trustee to enter into and carry out the Agreement, (ii) settles ARKK's Claim against the Estate, (iii) approves the Agreement and Settlements contained therein, and (iv) approves the Estate's sale of the Pitman Causes of Action and Proceeds thereof to ARKK free and clear of all claims, liens, and encumbrances.

## BASIS FOR RELIEF

67.    Bankruptcy Code section 502(b) allows the Court to determine objections to claims, while Bankruptcy Code section 105(a) enables the Court to issue any order that is necessary or appropriate to carry out the provisions of Title 11. Bankruptcy Rule 9019 manifests the Court's power to assess settlements. It provides: "[o]n motion by the trustee and after notice and a hearing,

the court may approve a compromise or settlement…"  The Agreement is a settlement resulting from extensive negotiations among the Trustee and ARKK that reflects a compromise of ARKK's Claim, ARKK's commitment to fund and prosecute the Pitman Causes of Action, and a sharing of the Net Proceeds of the Pitman Causes of Action between ARKK and the Estate.

68.     The standard in determining whether to approve a settlement is "whether the settlement is fair and equitable and in the best interest of the estate." *In re Hildreth*, No. 09-00293, 434 F.3d 639, 654 (8th Cir. 2008) (citing *In re Martin*, 212 B.R. 316, 319 (8th Cir. B.A.P. 1997). "A settlement is not required to constitute 'the best result possible.'" *Id*.  "'Rather, the court need only canvass the issues to determine that the settlement does not fall below the lowest point in the range of reasonableness.'" *Id*.  "[S]ettlement[s] are favored by the courts, and they will rarely be set aside absent fraud, collusion, mistake or other such factor." *In re Indian Motorcycle Co.*, 289 B.R. 269, 282 (B.A.P. 1st Cir. 2003); *see also ReGen Capital III, Inc. v. Official Comm. of Unsecured Creditors* (*In re Trism, Inc.*), 282 B.R. 662, 668 (B.A.P. 8th Cir. 2002) ("Compromise is favored by the law…. A major purpose of compromise is to avoid the expense, burdens, and uncertainty associated with litigation.").

69.     Approval of settlements is within the court's discretion. *Hildreth*, at 654.  However, while a court should apply its own independent judgment to determine whether to approve a settlement, it should also afford deference to the judgment of the trustee or debtor in possession. *See In re Receivership Estate of Indian Motorcycle Mfg., Inc*., 299 B.R. 8, 21 (D. Mass. 2003) (the court should give "substantial deference to the business judgment of a bankruptcy trustee when deciding whether to approve a settlement"); *Boisaubin v. Blackwell* (*In re Boisaubin*), 614 B.R. 557, 564 (B.A.P. 8th Cir. 2020) ("'[T]he 'best result obtainable' is not required in order for Trustee to meet his burden of proof.'").

17

70.     Courts generally examine four factors in determining whether to approve a

settlement or compromise: "(1) the probability of success in litigation; (2) the likely difficulties in

collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay

necessarily attending it; and (4) the paramount interest of the creditors."  *Id.*; *see also In re Tri-

State Financial*, *LLC*, 525 F.3d at 654 (citing *In re Martin*, 212 B.R. 291, 296 (Bankr. D. Del.

2006).

**I.     ARKK's Probability of Success on its Claim Weighs in Favor of Settlement.**

71.     All relevant factors weigh in favor of approving the settlement.  The first is

ARKK's probability of success.  As detailed above, ARKK filed its Amended Proof of Claim of

for approximately $23.4 million arising from breach of contract with Simply Essentials.  The

Trustee understands that the crux of the dispute is whether the MBA entitled ARKK to

commissions on all SE's sale or only the sales that ARKK procured.  The Trustee has reviewed

the MBA, the Henning Declaration, and the pleadings in connection with Pitman's Objection to

ARKK's claim.  Specifically, the language of the MBA provides:

> **Receipts**.  Except as otherwise provided herein, [ARKK] shall be
> entitled to ***all commissions*** on those net receipts of sales, ***whether
> procured by [ARKK] or not***, to the extent collected by SE.

MBA § 6(A) (emphasis added).

72.     The Henning Declaration supports that SE understood and intentionally provided

ARKK with a commission on all sales because ARKK acted as the sole sales representative and

client relation force:

> The MBA was intentionally structured as a 'non-procuring cause'
> commissions contract wherein SE was obligated to pay ARKK
> commissions on all of SE's sales, whether or not ARKK actually
> originated the sale, in exchange for ARKK's nationwide brokerage
> services.  While SE could have sought to structure the MBA as a
> "procuring cause" commissions contract, we purposely structured
> the MBA as a non-procuring cause commissions contract because,

18

> among other things (a) SE employed no dedicated personnel to sell
> its chicken product or maintain relationships with its clients, (b) the
> specialized nature of selling premium chicken product at high
> margin, (c) the focus of selling the whole chicken, not just the white
> meat, in order to maximize sales and profits, and (d) our knowledge
> of ARKK's extensive nationwide network.

Henning Decl. ¶ 12.  The Trustee therefore believes ARKK has a high probability of success that it is owed a commission on *all* of SE's sales and not just the portion of sales ARKK procured.

73.     The Trustee further understands a dispute exists as to whether ARKK would be entitled to expectation damages arising from SE's breach of the MBA.  The Trustee has reviewed the pleadings in connection with Pitman's Motion for Partial Summary Judgment and believes that ARKK has a high probably of success with regards to its argument that, under Delaware Law, expectation damages arise from SE's breach of the MBA.  The Trustee therefore has determined that the Estate faces a significant risk that ARKK would prevail against Pitman on the merits of its Claim, that the Estate would face liability of approximately $23.4 million, or potentially more pending ARKK's completion of discovery into the actual sales of SE.

74.     Finally, the Trustee understands that ARKK's damages calculation are based on the information it had available to it at the time it prepared the Proof of Claim and that, should ARKK discover that actual sales prior to SE's closure, which SE failed to disclose to ARKK, were higher than ARKK estimated, ARKK would amend its Proof of Claim to be higher than the $23.4 million already claimed.

## II.     The Complexity and Inconvenience in Litigating ARKK's Claim also Weigh in Favor of Settlement.

75.     The second and third factor including complexity, expense, inconvenience, and delay also have credible weight in approving this Settlement.  ARKK and Pitman Farms have already engaged, and continue to engage in, discovery related to ARKK's Claim.  The Trustee understands, based on its review of ARKK's Response to Statement of Material Undisputed Facts

(Dkt. # 185-3), that disputes of material fact exist as to (i) the date of the Debtor's first breach of the MBA, (ii) whether the MBA was terminated, (iii) the amount of damages ARKK reasonably believed it was entitled to at the time of breach and/or termination and as of the time of contracting, (iv) the historical and projected tends underlying ARKK's expectation damages calculation, (v) ARKK's projected costs of performance, and (vi) the dates that SE closed it operations, which could require further discovery. Moreover, the parties have already engaged in extensive briefing on ARKK's Claim (expending substantial judicial resources doing so), and are still in the preliminary stages of adjudication.

76.     While Pitman Farms has been undertaking the expenses in litigating its Objection to ARKK's Claim, an adverse result would be binding on the Estate. The Trustee can have no assurance that Pitman Farms will continue to expend resources litigating the Claim Objection, particularly where unsecured creditors would face *de minimis* recoveries. Moreover, as mentioned above, discovery could give rise to an even greater claim than ARKK is already asserting. Therefore, if this Motion and the Settlement is not approved, the Estate may need to get involved and deplete its limited resources prosecuting an objection to ARKK's Claim to avoid assertion of greater liability.

## III.     The Agreement and Settlements are in the Paramount Interests of Creditors.

77.     The fourth factor—paramount interests of creditors—weighs heavily in favor of approval of the Agreement as well. As detailed above, ARKK agrees to withdraw its Claim in exchange for the Estate transferring the Pitman Causes of Action and Proceeds thereof to ARKK, subject to the Estate retaining a 15% interest in the Net Proceeds of the Pitman Causes of Action. The benefits to the Estate from the Settlements are substantial, and far surpass the lowest point in the range of reasonableness required for approval under Bankruptcy Rule 9019 for the following reasons:

- *Withdrawal of ARKK's Claim.* Based on his review of ARKK's Proof of Claim and its briefing in connection with the Partial Summary Judgment Motion, the Trustee has determined that there is a high likelihood that ARKK is able to establish its Claim is valid. ARKK's agreement to withdraw its approximately $23.4 million, which is the single largest non-insider claim, represents immediate and quantifiable benefit to the Estate and unsecured claimholders. ARKK would be forgoing its share of distributions from the rolling stock sale, cash in accounts, and any future proceeds brought into the Estate.

- *Support of Sale Motion.* The Trustee has a limited period of time to consummate a sale before the stay is lifted on December 1, 2021. ARKK's agreement to withdraw its opposition and otherwise support the Trustee's sale will help ensure the highest price for the assets by enabling the Trustee to sell them as a package in Bankruptcy Court and provide a buyer with a free and clear order, rather than a piece meal sale by the purported secured creditors outside of bankruptcy. The sale price is relevant because ARKK intends to bring a lien avoidance action against Pitman's asserted secured claim. If successful, unsecured creditors of the Estate would be able to enjoy the portion of the proceeds of the Sale that would otherwise go to Pitman Farms.

- *Potential Elimination or Subordination of Insider Claims.* In addition to its objection to Pitman Farms' $5 million secured claim, ARKK intends to object to and/or seek equitable subordination of Pitman's asserted approximately $100 million in unsecured claims. These currently represent approximately 2/3 of all scheduled unsecured claims. Should ARKK prevail, the pro rata recoveries of non-insider unsecured claimholders will be dramatically increased.

- *Estate Proceeds from Pitman Causes of Action.* The Estate lacks sufficient resources to prosecute the Pitman Causes of Action.[5] The Trustee has further determined (i) the time and expense associated with administering and prosecuting the Pitman Causes of Action would deplete the limited resources of the Estate; (ii) that such litigation is complex, fact-intensive, and time-consuming; and (iii) because success is far from assured, the Estate may not recover sufficient proceeds to justify prosecuting the Pitman Causes of Action. The Trustee believes ARKK has the sophistication and resources to successfully represent the Estate in pursuit of the Pitman Causes of Action. ARKK's agreement to (i) be solely responsible for the Fees and Expenses (which could be between $1-$5 million) and (ii) provide the Estate with the Estate Proceeds, ensures the Estate will face no depletion in its limited resources, take no risk from pursuing complex, fact-intensive, and time-consuming litigation, and share in what could be substantial upside from these valuable causes of action.

---

[5]     As highlighted in Section II *supra*, the Estate cannot afford to take up the Objection if Pitman Farms does not pursue it. The Estate also bears a great amount of risk in ARKK succeeding in its Claim and defeating Pitman Farms' Objection.

**IV.    The Sale of the Pitman Causes of Action to ARKK is an Exercise of the Trustee's Business Judgment and Maximizes the Value of the Estate's Assets.**

78.    Bankruptcy Code section 363 enables a trustee, after notice and hearing, to sell property of the estate free and clear of any interest.

79.    Causes of action are intangible items of property of the estate that may be sold.  *In re Lahijani*, 325 B.R. 282, 287 (Bankr. App. 9th Cir. 2005); 11 U.S.C. § 541.  Property of the estate further includes interests in property recovered by the trustee pursuant to, *inter alia*, turnover and avoiding powers.  11 U.S..C § 541(a)(3).  The Trustee does not believe any entity asserts an interest in the Pitman Causes of Action, many of which, such as the Avoidance Actions, arose at the time of the Order for Relief was entered.

80.    Courts generally authorize a sale when it is justified upon the articulation of a sound business purpose of justification.  *Comm. Of Equity Sec. Holders v. Lional Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d. Cir. 1983).  In applying the sound business judgment test, courts consider four elements: (1) sound business reason or emergency justifies a pre-confirmation sale; (2) the sale has been proposed in good faith; (3) adequate and reasonable notice of the sale has been provided to interested parties; and (4) the purchase price is fair and reasonable.  *In re MCSGlobal Inc.*, 562 B.R. 648, 654 (Bankr, E.D. Va 2017); *In re LeBlanc Inc.*, 299 B.R. 546, 551 (N.D. Iowa 2003); *In re Equity Mgmt. Sys.*, 149 B.R. 120, 124 (S.D. Iowa 1993).  Each of these elements is met in the present case.

81.    *First,* in chapter 7 there is no "confirmation process."  The Estate benefits from immediate prosecution of the Pitman Causes of Actions to ensure any statute of limitations do not run.  These actions are complex, multi-dimensional, and will likely require comprehensive discovery efforts.  The sooner litigation can commence, the sooner the Estate can benefit from the Estate Proceeds and make corresponding distributions to creditors.

82.     *Second*, the sale has been proposed in good faith.  Both the Trustee and ARKK seek to maximize the value of the Pitman Causes of Action by ARKK prosecuting them to the fullest extent of the law.  Since both ARKK and the Estate benefit from Proceeds obtained from the prosecution of the Pitman Causes of Action, their incentives are fully aligned.  This can be contrasted with situations where causes of action are sold to the potential defendant of those causes of action, or an affiliate thereof, and are subsequently abandoned.

83.     *Third*, as evidenced by the certificates of service filed with this Court due, proper, timely, adequate and sufficient notice of the Motion, Hearing, and the Settlements and transactions contemplated by the Motion and proposed Order has been provided in accordance with the Bankruptcy Code and Bankruptcy Rules.

84.     *Fourth*, as explained above, the Trustee has determined, in his business judgment, that the consideration provided by ARKK is fair and reasonable. In exchange for the Pitman Causes of Action and Proceeds thereof, the Estate receives (i) the withdrawal of ARKK's $23.4 million claim, (ii) ARKK's support of the Sale Motion, (iii) its other affirmative covenants under the Agreement, (iv) its commitment to be fully responsible for the funding and prosecution of the Pitman Causes of Action (which it estimates could be between $1 million to $5 million), and (v) its provision of the Estate Proceeds, which equals 15% of the Net Proceeds from the prosecution of the Pitman Causes of Action.

85.     <u>Sale Free and Clear</u>.  Through the Sale, ARKK shall be granted title, pursuant to the Court's order approving this Motion, to the Pitman Causes of Action and Proceeds thereof, free and clear of any and all claims (including, but not limited to, any and all environmental claims and successor liability claims), liens, interests, titles, rights, and encumbrances.  Otherwise, the sale is "as is."

86.    <u>Best Interests of the Estate</u>.  The Trustee submits the Settlements and Sale of the Pitman Causes of Action and Proceeds thereof are in the best interests of the Estate and its non-insider creditors.  The Sale presents the best opportunity for creditors to receive meaningful distributions on account of their claims, could generate additional cash for the Trustee to administer this case, results in the withdrawal of the single largest non-insider claim, could result in the elimination or equitable subordination of approximately $100 million in Insider claims.

87.    <u>Waiver of Stay Period</u>. Any order approving this Motion should also provide the 14-day stay period in F.R.B.P. 6004(h) is inapplicable. Such a provision will enable ARKK to proceed immediately with prosecution of the Pitman Causes of Action, which will inure to the benefit of the Estate.

88.    <u>Good Faith Purchaser</u>. The Trustee submits the Agreement, the Settlements therein, and the Sale were negotiated at arm's length, in good faith, and with the opportunity to obtain the assistance and advice from counsel.  The Trustee submits the consideration provided by ARKK is fair to the Estate, is the best and highest offer for the Pitman Causes of Action and Proceeds thereof, is made in good faith, and agrees ARKK meets the criteria of a "good faith purchaser" for purposes of Bankruptcy Code section 363.

## CONCLUSION

WHEREFORE, the Trustee respectfully requests that this Court, after notice and opportunity for hearing pursuant to Bankruptcy Rules 2002 and 9019, and pursuant to Bankruptcy Code sections 105(a) and 502(b), approve the Motion and the Settlements outlined therein, and, pursuant to Bankruptcy Code section 363, approve the sale of the Pitman Causes of Action and

Proceeds thereof to ARKK, free and clear of all claims and encumbrances, and for such other and

further relief as the Court may deem just and equitable under the circumstances.

Dated November 11, 2021.

/s/ Larry S. Eide
Larry S. Eide, Trustee (AT0002317)
PO Box 1588
Mason City, Iowa 50402-1588
Telephone: 641.423.4264
Facsimile: 641.423.3145
Email: eide@pappajohnlaw.com

## Certificate of Service

The undersigned certifies, under penalty of perjury, that on this 11th day of November, 2021, the foregoing document was electronically filed with the Clerk of Court using the Northern District of Iowa CM/ECF and the document was served electronically through the CM/ECF system to the parties of this case

/s/ Larry S. Eide
Larry S. Eide (AT0002317)