## CLAIM SETTLEMENT AND SALE AGREEMENT

This Claim Settlement and Sale Agreement (together with the exhibits attached hereto, which include, without limitation the Term Sheet (as defined herein) attached hereto as **Exhibit A**, as each may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof, the "**Agreement**") dated as of November 2, 2021 is entered into by and among ARKK Food Company, LLC. ("**ARKK**") and Larry S. Eide, in his capacity as trustee (the "**Trustee**") and representative of the estate of Chapter 7 debtor Simply Essentials, LLC (the "**Debtor**" or "**SE**"), pending in the N.D. of Iowa Bankruptcy Court as Case No. 20-00305 (TJC) (the "**Chapter 7 Case**").   This Agreement collectively refers to ARKK and the Trustee as the "**Parties**" and each individually as a "**Party**."

## RECITALS[1]

**WHEREAS,** on September 11, 2017, ARKK and SE entered into a certain Master Broker Agreement ("**MBA**"), a copy of which is attached as Exhibit A to ARKK's Proof of Claim (as defined below).

**WHEREAS,** on March 6, 2020 (the "**Petition Date**"), certain creditors filed an involuntary petition (the "**Involuntary Petition**") for relief against SE under Bankruptcy Code section 303 in the U.S. Bankruptcy Court for the Northern District of Iowa (the "**Bankruptcy Court**").

**WHEREAS,** on September 22, 2020, an order for relief pursuant to the Involuntary Petition was entered.

**WHEREAS**, on September 22, 2020, Larry S. Eide was appointed as interim trustee in the Chapter 7 Case pursuant to Bankruptcy Code section 701(a), and continues to exercise all the rights, powers, and responsibilities of a trustee in the Chapter 7 Case pursuant to Bankruptcy Code section 701(c).

**WHEREAS**, the Trustee has the statutory right under the Bankruptcy Code to serve as representative of the Estate and prosecute certain causes of action belonging to the Estate.

**WHEREAS**, on February 10, 2021, ARKK filed Proof of Claim #28 (as subsequently amended, and attached hereto as **Exhibit B**, "**ARKK's Proof of Claim**", and the claim embodied therein, "**ARKK's Claim**").

**WHEREAS**, on April 27, 2021, Pitman Farms filed an objection to ARKK's Proof of Claim (the "**Claim Objection**").

**WHEREAS**, on May 21, 2021, ARKK filed its  for $23,388,251.79, inclusive of unpaid commissions and expectation damages arising from breach of the MBA.

**WHEREAS**, on September 13, 2021, Pitman Farms filed a motion for partial summary judgment (together with supporting documents, the "**Partial Summary Judgement Motion**")

---

[1] Capitalized terms used in these Recitals that are not otherwise defined above shall have the meaning given to them in Section 1 of the Agreement.

seeking to reduce ARKK's Proof of Claim by the amount of commission payments ARKK alleged it reasonably expected if SE had continued to perform the MBA after September 2020.

**WHEREAS**, on October 4, 2021, ARKK filed an objection to the Partial Summary Judgment (together with supporting documents, the "**Objection**"), arguing, *inter alia*, that Delaware law provides for expectation damages based on the non-breaching parties' reasonable expectations at the time of contracting, and that a dispute of material fact exists as to when SE's breach of the MBA occurred.

**WHEREAS**, on October 12, 2021, Pitman filed a reply to the Objection (the "**Reply**") and, on October 22, 2021, ARKK will be filed a Surreply.

**WHEREAS**, the Trustee has reviewed ARKK's Proof of Claim, the Claim Objection, the Partial Summary Judgment Motion, the Objection, the Reply, and Surreply, and has determined that (i) the issues are complex, (ii) the Objection has already resulted in, and likely will continue to result in, lengthy litigation and discovery, and (iii) the Estate could face significant claim liability if ARKK's Claim is meritorious and is entitled to expectation damages flowing from the MBA as a matter of law. The Trustee has further determined that ARKK's Proof of Claim is the largest single non-insider claim asserted against the Estate.

**WHEREAS**, the Parties desire to settle ARKK's Claim.

**WHEREAS**, in consideration for, *inter alia*, ARKK agreeing to (a) withdraw its claim, (b) support a sale of the Assets by the Trustee, (c) prosecute the Pitman Causes of Action on behalf of the Trustee and Estate, (d) assume all Fees and Expenses in connection with the prosecution of the Pitman Causes of Action (defined below), and (e) provide the Estate with a percentage recovery of Proceeds of the Pitman Causes of Action, the Trustee desires to sell ARKK, free and clear of any liens, interests, and encumbrances, an undivided one hundred percent (100%) interest in the Pitman Causes of Action and Proceeds thereof on the terms and conditions herein set forth.

**WHEREAS**, the Parties desire to cooperate for the purpose of recovering Proceeds of the Pitman Causes of Action (whether by settlement, litigation or otherwise) pursuant to the terms, and in the manner, set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

**Section I.    Definitions**

1.01    <u>Definitions</u>. Unless otherwise specified, each undefined capitalized term shall have the meaning given to it in the Bankruptcy Code. As used in this Agreement, the following terms have the following meanings:

(a)    "**9019 Order**" means a Final Order granting the 9019 Motion.

(b)    "**9019 Motion**" has the meaning given to such term in Section 6.02.

(c) "**Administrative Claim**" means a Claim for costs and expenses of administration pursuant to sections 502(h) 503(b), 507(a)(2), or 507(b) of the Bankruptcy Code, including all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code.

(d) "**ARKK Proceeds**" has the meaning in Section 5.02.

(e) "**ARKK's Proof of Claim**" and "ARKK's Claim" have the meanings given in the preamble.

(f) "**Avoidance Actions**" means any and all actual or potential claims and causes of action to avoid a transfer of property or an obligation incurred by the Debtor pursuant to any applicable section of the Bankruptcy Code, including sections 502, 544, 545, 547, 548, 549, 550, 551, 553(b), and 724(a) of the Bankruptcy Code, or under similar or related state or federal statutes and common law.

(g) "**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532. 18.

(h) "**Bankruptcy Court**" has the meaning in the preamble.

(i) "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local and chambers rules of the Bankruptcy Court.

(j) "**Causes of Action**" means all actions, causes of action (including Avoidance Actions), liabilities, obligations, rights, suits, damages, judgments, remedies, demands, setoffs, defenses, recoupments, crossclaims, counterclaims, third-party claims, indemnity claims, contribution claims, or any other claims whatsoever, in each case held by the Estate, whether known or unknown, matured or unmatured, fixed or contingent, liquidated or unliquidated, disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 7 Case.

(k) "**Chapter 7 Case**" has the meaning in the preamble.

(l) "**Claim**" means any claim, as such term is defined in section 101(5) of the Bankruptcy Code, against the Debtor.

(m) "**Debtor**" has the meaning in the preamble.

(n) "**Estate**" means the estate created for the Debtor in its Chapter 7 Case pursuant to section 541 of the Bankruptcy Code.

(o) "**Estate Proceeds**" has the meaning in Section 5.02.

(p) "**Fees and Expenses**" has the meaning in Section 4.01.

(q) "**Final Order**" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal, seek certiorari, or move for a new trial, re-argument, or rehearing has expired and no appeal, petition for certiorari, or motion for a new trial, re-argument, or rehearing has been timely filed, or as to which any appeal that has been taken, any petition for certiorari, or motion for a new trial, review, re-argument, or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought.

(r) "**Gross Proceeds**" has the meaning in Section 5.01.

(s) "**Insiders**" means all of SE's members, board members, partners, general partners, officers, persons in control, directors, and relatives of such general partners, directors, officers, or persons in control of SE, including, but not limited to, Pitman Farms, Pitman Family Farms, David B. Pitman, Richard J. Pitman, Ben Pitman, Maren Pitman, Mary Pitman, Western Grain & Milling, and any of the forgoing entities' subsidiaries, directors, officers, assigns, agents, transferees, and affiliates, and any of the foregoing persons' or entities' aliases, and, for the avoidance of doubt, shall also include any 'insider' as that term is understood under section 101(31) of the Bankruptcy Code or as that term is understood in applicable common law.

(t) "**Net Proceeds**" has the meaning in Section 5.02.

(u) "**Pitman Causes of Action**" has the meaning in Section 3.01.

(v) "**Pitman Farms**" means the entity identified as the sole member and manager of Simply Essentials, Inc., variously referred to as Pitman Farms, Pitman Farms, Inc., or any other names, aliases, or DBA's, used to identify itself.

(w) "**Proceeds**" means any form of property, including, but not limited to, legal or equitable interests, cash, interest, penalties, legal fees, fees, damages, settlements, reimbursements, costs, expenses, sanctions, penalties, monetary award, securities, membership interests, partnership interests, liens, security interests, contingent interests, rights or other property paid, distributed by, or on behalf of any party in satisfaction, settlement, or resolution of a cause of action.

(x) "**Schedules**" means the Schedules of Assets and Liabilities and the Statement of Financial Affairs for each of the Debtor, filed with the Bankruptcy Court.

(y) "**Simply Essentials**" or "**SE**" means Simply Essentials, LLC.

1.02    Exhibits Incorporated by Reference.    Each of the exhibits attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include the exhibits.

## Section II.   Settlement of ARRK's Claim

2.01     Withdrawal of ARRK's Claim.  Upon entry of the 9019 Order, ARRK shall:

    (a)   withdraw ARRK's Claim against the Estate;

    (b)   not file or assert any claim arising from or related to the Debtor's alleged breach of the MBA against the Estate in the Chapter 7 Case;

    (c)   not file any claim against the Estate in the Chapter 7 Case on account of pre-petition conduct of the Debtor that is currently known, or reasonably should be known, by ARRK, and

    (d)   not seek any distribution from the Estate on account of ARRK's Claim.

2.02     Support of Trustee's Sale Motion.  Upon entry of the 9019 Order, ARRK shall:

    (a)   withdraw with prejudice its objection (Dkt. # 128)[2] and reservation of rights (Dkt. # 156) to the pending sale motion (Dkt. # 149) (the "**Sale Motion**"); and

    (b)   support and/or not take any action adverse to the Trustee's efforts to sell the Assets (as defined in the Sale Motion); provided, however, that ARRK shall not be required to take any action that it reasonably determines may interfere with and/or adversely affect the prosecution of the Pitman Causes of Action.

2.03     Time is of the Essence.  The Parties acknowledge and agree that time is of the essence with respect to each party's performance of its obligations under this Agreement.

## Section III.   Transfer and Sale of the Pitman Causes of Action and Proceeds Thereof

3.01     Pitman Causes of Action.  The Trustee, in accordance with his statutory duties under the Bankruptcy Code, has undertaken to identify and investigate any Causes of Action the Estate may have against Pitman Farms and Insiders (the "**Pitman Causes of Action**"). The Trustee represents that ARRK has provided him with the *Declaration of Todd Henning*, attached hereto as **Exhibit C**, and that he has carefully reviewed and considered the contents therein.   The Trustee hereby represents that he has made an informed and independent determination that, in his reasonable business judgment:

    (a)   the time and expense associated with administering and prosecuting the Pitman Causes of Action would deplete the limited resources of the Estate;

    (b)   the Estate lacks sufficient resources to prosecute the Pitman Causes of Action;

    (c)   that such litigation is complex, fact-intensive, and time-consuming; and

---

[2]   All docket references shall refer to Case No. 20-bk-00305 (TJC).

(d)  because success is far from assured, the Estate may not recover sufficient proceeds to justify prosecuting the Pitman Causes of Action.

3.02    Transfer of the Pitman Causes of Action.

(a)  The Trustee represents that he is aware that ARKK (i) believes that the Pitman Causes of Action have significant value, (ii) is willing to undertake the time, expenses, and risks involved in prosecuting the Pitman Causes of Action, and (iii) ARKK reasonably estimates the fees and expenses associated with prosecuting the Pitman Causes of Action to be between $1 million to $5 million.

(b)  The Trustee represents and warrants that (i) the Estate is the sole legal and beneficial owner of, and has good and marketable title to, all rights in connection with the Pitman Causes of Action, including the Proceeds thereof, (ii) that no party has asserted any lien, security interest, contingent interest, equitable interest, participation, setoff, or encumbrance on the same, and (iii) the Trustee has full right, power, and authority to transfer and assign the Pitman Causes of Actions and Proceeds thereof.

(c)  Accordingly, in consideration for (i) the withdrawal of ARKK's Claim as set forth in Section 2.01, (ii) ARKK's support of the Trustee's Sale Motion as set forth in Section 2.02, (iii) the Estate Proceeds as set forth in Section 5.02, and (iv) ARKK's other affirmative obligations and covenants set forth in this Agreement, the Trustee hereby agrees, in his business judgment, to sell, transfer, convey, and assign, subject to the Estate Proceeds, the Estate's rights, title, and interest in the Pitman Causes of Action and Proceeds thereof, including but not limited to those for the recovery of money and property under claims or theories of fraudulent transfer, preferential transfer, equitable subordination, breach of fiduciary duty, equitable lien, and constructive trust, to ARKK.

3.03    Ownership of the Pitman Causes of Action. Following the sale, transfer, conveyance, and assignment from the Estate to ARKK of the Pitman Causes of Action and Proceeds thereof, as set forth in Section 3.02:

(a)  ARKK shall be the sole owner, free and clear of any and all liens, claims, and encumbrances, of the Pitman Causes of Action and Proceeds thereof (subject to the Estate Proceeds), which shall be considered ARKK's property; and

(b)  ARKK, as owner of the Pitman Causes of Action, shall have full control over the investigation, prosecution, litigation strategy, negotiations, settlement determinations, resolution, and disposition of the Pitman Causes of Action.

(c)  Subject to the Estate Proceeds and all rights of the Estate and Trustee in this Agreement, ARKK may transfer its interest in the Pitman Causes of Action to any special purpose vehicle, LLC, or trust ("**SPV**") that ARKK currently controls or subsequently establishes for the purposes of prosecuting the Pitman Causes of Action, and such SPV shall assume all rights, powers, and identities that ARKK exercises under this Agreement.

3.04     Good Faith Purchaser

(a) The Trustee's sale, transfer, and assignment to ARKK of the Pitman Causes of Action and Proceeds thereof is made *as is*, with no representations or guarantees to ARKK as to their value of prospect for recovery.

(b) The Trustee agrees the consideration provided by ARKK under this Agreement and as set forth in Section 3.02(c) is fair to the Estate, is the best and highest offer for the Pitman Causes of Action and Proceeds thereof, is made in good faith, and agrees that ARKK meets the criteria of a "good faith purchaser" for purposes of Bankruptcy Code section 363.

**Section IV.     Prosecution of the Pitman Causes of Action**

4.01     Fees and Expenses.

(a) ARKK shall be solely responsible for all fees and expenses, including attorneys' fees and litigation costs, relating to the pursuit and prosecution of the Pitman Causes of Action (the "**Fees and Expenses**").

(b) ARKK shall have no ability to seek compensation from the Estate, including on an Administrative Claim basis, for Fees and Expenses incurred in connection with prosecuting the Pitman Causes of Action.

(c) ARKK shall have full discretion over the firms, businesses, consultants, agents, advisors, attorneys, accountants, financial advisors, investigators, or other professionals it retains relating to its prosecution, evaluation, and resolution of the Pitman Causes of Action.

(d) ARKK shall separately account for the Fees and Expenses from other fees and expenses ARKK may incur that do not relate to the Pitman Causes of Action.

4.02     ARKK's Standing to Prosecute the Pitman Causes of Action.  The Parties hereby agree that:

(a) ARKK, as the sole owner of the Pitman Causes of Action, shall have standing to appear in its own capacity and/or on behalf of, and as representative of, the Trustee and Estate, in the Bankruptcy Court, or other court of competent jurisdiction, for all purposes, including but not limited to, prosecuting, settling, or resolving, the Pitman Causes of Action, as if such Causes of Action had been brought by the Trustee; and

(b) ARKK shall be considered a party-in-interest in the Chapter 7 Case and shall be able to raise and be heard on any issue.

4.03    Assignment of Trustee Powers in Connection with Pitman Causes of Action.

(a)    The Trustee hereby assigns its avoidance powers under Chapter 5 of the Bankruptcy Code to ARKK solely purposes of ARKK's prosecution and disposition of the Pitman Causes of Action.

(b)    As assignee, the Parties agree ARKK shall have the power to sue in the Trustee's name and represent the Trustee for purposes of the Pitman Causes of Action.

(c)    Should ARKK's standing or ability to represent the Trustee in connection with the Pitman Causes of Action be found invalid or deficient, in whole or in part, the Trustee agrees to cooperate with ARKK, including by joining in any pleading or exercising such power, to cure such deficiency so that ARKK can pursue the Pitman Causes of Action for the benefit of the Estate.

4.04    Cooperation.

(a)    The Trustee agrees, consistent with his statutory duties under the Bankruptcy Code, to follow ARKK's reasonable instructions to cooperate with ARKK in pursuing the Pitman Causes of Action, such as by recovering property of the estate and/or liquidating Proceeds of the Pitman Causes of Action, which shall include, but not be limited to, sharing of any documents and information in his possession or readily obtainable relating thereto.

(b)    The Trustee agrees to not take any action, or omit to take any action, which would reasonably be expected to materially impede or frustrate ARKK's pursuit of the Pitman Causes of Action; provided, however, that the Trustee may take, or refrain from taking, any and all actions as are necessary to comply with his statutory duties under the Bankruptcy Code.

4.05    Derivative Standing.  Should ARKK's standing be found to be deficient, in whole or in part, in pursuing the Pitman Causes of Action and/or effectuating any settlement or judgment related thereto, the Trustee agrees that it is necessary and beneficial to the Estate that ARKK pursue the Pitman Causes of Action.  The Trustee hereby consents to ARKK having derivative standing to pursue the Pitman Causes of Action, and exercise all powers of the Trustee in connection therewith, and will cooperate with ARKK in undertaking all measures to ensure derivative standing is approved by the Bankruptcy Court or other court of competent jurisdiction, if necessary.

4.06    Alternative Prosecution Model.  The Parties agree that prosecution of the Pitman Causes of Action is of paramount importance and in the best interest of the Estate.  Therefore, if the Parties determine that ARKK's ability to prosecute the Pitman Causes of Action on behalf of the Estate either as owner of the Causes of Action or through derivative standing are subject to a successful or credible challenge or are unworkable or impracticable, the Parties agree to work in good faith to pursue an "**Alternative Prosecution Model**" whereby the Trustee will retain special litigation counsel of ARKK's choice, and, through such counsel, prosecute the Pitman Causes of Action, at ARKK's expense.  The Alternative Prosecution

8

Model shall, in all other respects, preserves the basic economic deal embodied in this Agreement.

**Section V.    Proceeds of the Pitman Causes of Action**

5.01    <u>First Proceeds Applied to Fees and Expenses</u>.

(a)    Except as provided in subsection (b) below, the Proceeds of the Pitman Causes of Action received pursuant to a damages award by a court of competent jurisdiction after exhaustion of all appeals (or time for such appeals having expired), or pursuant to a binding settlement agreement, which shall be free and clear from any liens, encumbrances or claims from any other party in interest, including assertion of Administrative Claims, (the "<u>Gross Proceeds</u>") shall be first applied to the payment of all Fees and Expenses.

(b)    ARKK seeks to pursue avoidance of Pitman Farm's asserted secured claim (Proof of Claim #2) on certain assets of the Debtor.  To the extent Pitman Farm's asserted lien is avoided, its claim disallowed, the lien is recovered for the benefit of the Estate, or the action is settled, such Gross Proceeds will be shared as set forth in Section 5.02 below and will not be first applied to payment of Fees and Expenses.

5.02    <u>Division of Net Proceeds</u>.  After payment in full of the Fees and Expenses as provided above, the remaining proceeds (the "**Net Proceeds**"), which shall be free and clear from any liens, claims, and encumbrances, including any assertion of Administrative Claims, shall be divided as follows:

(a)  85% to ARKK ("**ARKK Proceeds**"); and

(b)  15% to the Estate ("**Estate Proceeds**").

**Section VI.    9019 Motion**

6.01    <u>The Agreement is in the Best Interests of the Estate</u>.  The Trustee agrees, in the exercise of his business judgment, that the settlements in this Agreement, including ARKK's prosecution of the Pitman Causes of Action, are reasonable, fair, and in the best interests of the Estate.  The Trustee further agrees he has all necessary powers to enter into this Agreement, bind the Estate (subject to any necessary Bankruptcy Court approvals), and that entry into this Agreement is consistent with his statutory duties under the Bankruptcy Code.

6.02    <u>9019 Motion</u>.

(a)    As soon as reasonably practicable following execution of the Agreement, but in any event no later than five (5) business days following the date hereof, the Trustee shall file a motion pursuant to Rule 9019 of the Bankruptcy Rules, together with required supporting papers and required notices, with the Bankruptcy Court seeking approval of the settlements and transfers contained in the Agreement (the "**9019 Motion**").

(b) The Parties shall exercise best efforts to obtain Bankruptcy Court approval in the form of the 9019 Order, and any other court approvals that may be required, including a motion under Bankruptcy Code sections 105, 363, or 554, that is acceptable to both Parties and that reflects the terms of the Agreement to the satisfaction of both Parties.

(c) The 9019 Order shall include a finding that ARKK has standing to prosecute the Pitman Causes of Action.

6.03    Stay of Pitman Farms Claim Objection.

(a) Upon entry of the 9019 Order and the withdrawal of ARKK's Claim, the Parties agree that Pitman Farms' Claim Objection shall be rendered moot.

(b) While the 9019 Motion is pending, the Trustee shall support ARKK's effort to stay the Claim Objection, including by filing a joinder thereto.

## Section VII.   Termination

7.01    Termination. Except as provided in Section 7.02 below, this Agreement may be terminated by ARKK or the Trustee, upon five (5) business days' prior written notice delivered to the other aforementioned Party within ten (10) business days after the occurrence of any of the following events (each a "**Termination Event**");

(a) following the delivery of written notice thereof by a nonbreaching Party, the occurrence of a material breach by any of the Parties of any of its obligations, representations, warranties, covenants or commitments set forth in this Agreement that is either unable to be cured or is not cured within five (5) business days following the delivery of such notice;

(b) any Party publicly disavows any of the terms set forth on the Term Sheet or enters into, or publicly supports, a proposed transaction materially inconsistent with such terms;

(c) the closure, dismissal, or conversion of the Chapter 7 Case;

(d) the approval, recommendation, or any public statement in support by the Trustee into any direct negotiations, any agreement, agreement in principle, understanding, term sheet, letter of intent, purchase agreement, option or similar contract, instrument or arrangement with respect to the subject matter of this Agreement that is materially inconsistent with the Term Sheet;

(e) removal or replacement of the Trustee, including pursuant to Bankruptcy Code section 324;

(f) the failure to obtain a 9019 Order as described in Section 6.02 above after two attempts; and

(g) the determination by ARKK that the Pitman Causes of Action have been fully prosecuted, disposed of, or settled, or that any remaining Causes of Action should not be pursued.

7.02     No Termination Based on Own Breach.  No Party may terminate this Agreement upon a Termination Event if such Termination Event is the result of such Party failing to perform or comply in any material respect with the terms and conditions of this Agreement.

## Section VIII.  Miscellaneous

8.01     GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM. THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF IOWA APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF. Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement in the Bankruptcy Court (or court of proper appellate jurisdiction) (the "**Chosen Court**"), and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Chosen Court; (b) waives any objection to laying venue in any such action or proceeding in the Chosen Court; and (c) waives any objection that the Chosen Court is an inconvenient forum or does not have jurisdiction over any Party hereto or constitutional authority to finally adjudicate the matter.

8.02     Waiver of Jury Trial. EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

8.03     Entire Agreement. This Agreement constitutes the entire agreement among the Parties with respect to the transactions contemplated herein and supersedes all prior agreements, oral, or written, among the Parties with respect thereto.

8.04     Headings. The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

8.05     Rules of Construction. When a reference is made in this Agreement to a section or exhibit, such reference shall be to a section or exhibit, respectively, of or attached to this Agreement unless otherwise indicated. Unless the context of this Agreement otherwise requires, (a) words using the singular or plural number also include the plural or singular number, respectively, (b) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire Agreement, (c) the words "include," "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation," and (d) the word "or" shall not be exclusive and shall be read to mean "and/or." "Writing," "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form, and any requirement that any notice, consent or other information shall be provided "in writing" shall include email.

Any reference to "business day" means any day, other than a Saturday, a Sunday or any other day on which banks located in New York, New York are closed for business as a result of federal, state or local holiday and any other reference to day means a calendar day.

8.06     <u>Interpretation; Representation by Counsel</u>. This Agreement is the product of negotiations among the Parties and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof. The Parties were each represented by, or had the opportunity to be represented by, counsel during the negotiations and drafting of this Agreement and, therefore, waive the application of any law, regulation, holding or rule of construction (a) providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document or (b) any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel.

8.07     <u>Successors and Assigns; No Third Party Beneficiaries</u>. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable. There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

8.08     <u>Notices</u>. All notices hereunder shall be deemed given if in writing and delivered by electronic mail, courier, or registered or certified mail (return receipt requested) (and if by any method other than electronic mail, then with a copy by electronic mail) to the following addresses (or at such other addresses as shall be specified by like notice):

       i.   If to ARKK:

                 PROSKAUER ROSE LLP
                 70 West Madison, Suite 3800
                 Chicago, IL 60602
                 Attention: Todd Ohlms
                 Email: tohlms@proskauer.com

      ii.   If to the Trustee:

                 Larry S. Eide, Trustee (AT0002317)
                 PO Box 1588
                 Mason City, Iowa 50402-1588
                 Email: eide@pappajohnlaw.com

8.09     <u>Independent Analysis</u>. Each Party hereby confirms that its decision to execute this Agreement has been based upon its independent assessment of documents and information available to it, as it has deemed appropriate.

8.10     <u>Waiver.</u> No Party shall be deemed to have waived any rights as a result of its entry into this Agreement, and, if this Agreement is terminated for any reason, the Parties fully

reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

8.11    <u>Relationship Among Parties</u>. Notwithstanding anything herein to the contrary, (i) the duties and obligations of the Parties under this Agreement shall be several, not joint, (ii) no Party shall have any responsibility by virtue of this Agreement for any trading by any other entity; (iii) no prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this Agreement; (iv) the Parties hereto acknowledge that this Agreement does not constitute an agreement, arrangement or understanding with respect to acting together for the purpose of acquiring, holding, voting or disposing of any securities of the Debtor and the Parties do not constitute a "group" within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended; (v) ARKK shall not have any fiduciary duty, any duty of trust or confidence in any form to the Trustee or Estate; and (vi) no action taken by any Party pursuant to this Agreement shall be deemed to constitute or to create a presumption by any of the Parties that the Parties are in any way acting in concert or as such a "group."

8.12    <u>Several, Not Joint and Several, Obligations</u>. Except as otherwise expressly set forth herein, the agreements, representations, warranties, liabilities and obligations of the Parties under this Agreement are, in all respects, several and not joint and several.

8.13    <u>Severability and Construction</u>. If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, in whole or in part, the remaining provisions shall remain in full force and effect. Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

8.14    <u>Settlement Discussions</u>. This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties. Pursuant to Rule 408 of the Federal Rules of Evidence, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

*[Remainder of page intentionally left blank]*

**IN WITNESS WHEREOF**, the Parties have executed this Agreement on the day and year first above written.

The Trustee

By: _____

Name:  Larry S. Eide

Title: Trustee of Chapter 7 Debtor Simply Essentials, Inc.


ARKK FOOD COMPANY, LLC

By: _____

Name: Peter Andoni

Title: C.E.O.

# EXHIBIT A

Term Sheet

CONFIDENTIAL SETTLEMENT COMMUNICATIONS PER FRE RULE 408
DRAFT // SUBJECT TO CHANGE

## Simply Essentials / ARKK Settlement Term Sheet

This term sheet (the "Term Sheet") is intended to set forth certain agreements between ARKK Food Company, LLC. ("ARKK") and Larry S. Eide, in his capacity as trustee (the "Trustee", and together with ARKK, the "Parties") of Chapter 7 debtor Simply Essentials, LLC (the "Debtor" or "SE"), pending in the N.D. of Iowa Bankruptcy Court as Case No. 20-00305 (TJC) (the "Chapter 7 Case") ,with respect to the settlement of ARKK's Proof of Claim, in which ARKK claims $23,388,251.79 on account of the Debtor's breach of a certain Master Broker Agreement (POC No. 28 as amended) (the "Claim")..

This Term Sheet does not address all material terms that would be required in definitive documents and is subject to definitive documentation in form and substance mutually agreed upon by the Parties (the "Definitive Settlement Agreement").

| | |
|---|---|
| **ARKK's Claim** | Upon entry of a final 9019 Order (defined below), ARKK shall withdraw its Claim against the Estate,[1] and shall not file or assert any claim arising from or related to the Debtor's alleged breach of the MBA against the Estate in the pending Chapter 7 Case. ARKK shall not file any claim against the Estate on account of pre-petition conduct of the Debtor currently known by ARKK. ARKK shall not seek any distribution from the Estate on account of its Claim. |
| **Trustee's Asset Sale** | ARKK shall withdraw with prejudice its objection (Dkt. # 128)[2] and/or reservation of rights (Dkt. # 156) to the pending sale motion (Dkt. # 149) (the "Sale Motion"), and shall agree to support and/or not take any action adverse to the Trustee's efforts to sell the Assets (as defined in the Sale Motion), except to the extent it may interfere and/or affect in any adverse way ARKK's prosecution of the Causes of Action, as described below. |
| **Estate Causes of Action** | The Trustee has made an informed and independent determination that, in his business judgment, the time and expense associated with prosecuting the Causes of Action (defined below) would deplete the limited resources of the Estate, that litigation is complex, time-consuming, and risky, and the Estate may not recover sufficient proceeds to justify prosecuting the Causes of Action. The Trustee is aware that ARKK disagrees with his determination, believes that the Causes of Action have substantial value, and that ARKK is willing to undertake the time, expenses, and risks involved in prosecuting the Causes of Action. |

---

[1]     "Estate" shall have the meaning given to it in Bankruptcy Code section 541, and shall hold all property of the Debtor's estate, including the Causes of Action, as set forth in the same section.

[2]     All docket references shall refer to Case No. 20-bk-00305 (TJC).

| | |
|---|---|
| | The Trustee has reviewed ARKK's Claim and its objection to Pitman Farms, Inc.'s ("Pitman Farms") motion for partial summary judgment (Dkt. # 185), and has determined that the Estate could face significant liability if ARKK's Claim is meritorious.

Accordingly, in consideration for the withdrawal of ARKK's Claim and ARKK's affirmative obligations in this Term Sheet, the Trustee agrees, in his business judgment, to transfer all causes of action held by the Debtor's Estate against any insiders, Pitman Farms, Pitman Family Farms, David B. Pitman, Richard J. Pitman, Ben Pitman, Maren Pitman, Western Grain & Milling, and any Pitman Farms subsidiaries, officers, assigns, and affiliates, including those arising under Chapter 5 of the Bankruptcy Code, (collectively, the "Causes of Action") to ARKK.

ARKK shall be the sole owner of the Causes of Action (subject to the Estate Proceeds), which shall be considered ARKK's property, shall have full control over the litigation strategy and settlement determinations, and shall have standing to appear on behalf of, and as representative of, the Estate in prosecuting the Causes of Action as if the Causes of Action had been brought by the Trustee. |
| **Fees and Expenses** | ARKK shall be solely responsible for all fees and expenses, including attorney's fees, relating to the pursuit of the Causes of Action. ARKK shall have no ability to seek compensation, including on an administrative expense basis, from the Estate for fees and expenses incurred in connection with prosecuting the Causes of Action. |
| **Proceeds of Causes of Action** | With one exception below, the first proceeds of the Causes of Action, which shall be free and clear from any encumbrances from any other party in interest, including assertion of administrative expense claims, shall be applied to the payment of all Fees and Expenses incurred by ARKK in the prosecution of the Causes of Action.

After payment in full of the Fees and Expenses, the remaining proceeds (the "Net Proceeds"), which shall be free and clear from any encumbrances, including assertion of administrative expense claims, shall be divided as follows:

- 85% to ARKK ("ARKK Proceeds");

- 15% to the Debtor's Estate ("Estate Proceeds"). |

| | |
|---|---|
| | **Exception**: ARKK seeks to pursue avoidance of Pitman Farm's asserted secured claim (Proof of Claim #2). To the extent Pitman Farm's lien is avoided or the avoidance action is settled, any proceeds obtained will be shared 85% to ARKK and 15% to the Debtor's Estate, but no proceeds will be applied to payment of the Fees and Expenses. |
| **9019 Motion** | The Trustee agrees that the settlements in this Term Sheet are reasonable, fair, and in the best interests of the Estate. The Trustee further agrees that entry into this settlement is an exercise of his business judgment.<br><br>The Trustee shall file a motion pursuant to Fed. R. Bankr. P. Rule 9019 (the "9019 Motion") with the Chapter 7 bankruptcy court seeking approval of the Definitive Settlement Agreement by ARKK and the Trustee. The Parties shall exercise best efforts to obtain court approval in the form of a 9019 Order, and any other Court approvals that may be required, including a motion under Bankruptcy Code section 363, that is acceptable to both Parties and that reflects the terms of the Definitive Settlement Agreement to the satisfaction of both Parties. Failure to obtain a 9019 Order and/or other required orders, after two attempts shall entitled ARRK to terminate the Definitive Settlement Agreement. |
| **Pending Pitman Claim Objection** | Upon entry of a final 9019 Order and ARKK's withdrawal of its Claim, the Parties agree that Pitman Farms' pending objection to ARKK's Claim (Dkt. # 95) (the "Claim Objection") shall be rendered moot.<br><br>While the 9019 Motion is pending, the Trustee shall support ARKK's effort to stay the Claim Objection, including by filing a joinder thereto. |
| **Party-in-Interest** | In its capacity as representative of the Estate for purpose of prosecuting the Causes of Action, ARKK shall be considered a party-in-interest in the Chapter 7 Case under Bankruptcy Code section 1109, and shall be able to raise and be heard on any issue. |
| **Cooperation** | The Trustee agrees, consistent with his statutory duties, to exercise reasonable efforts to cooperate with ARKK in pursuing the Causes of Action. The Trustee agrees to not oppose any action ARKK may take in pursuit of the Causes of Action, provided, however, that the Trustee may take any and all necessary actions consistent with his statutory duties under the Bankruptcy Code. |

| | |
|---|---|
| **Definitive Settlement Agreement** | Each Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and shall exercise commercially reasonable efforts with respect to, the negotiation, drafting, execution, and delivery of the Definitive Settlement Agreement. |

**EXHIBIT B**

ARKK Amended Proof of Claim

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor 1 | Simply Essentials, LLC |
| Debtor 2 (Spouse, if filing) | |

United States Bankruptcy Court for the: Northern District of Iowa

Case number  20-00305

## Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

ARKK Food Company, Inc.
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor  ARKK Food Company

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Todd J. Ohlms, Proskauer Rose LLP
Name

70 West Madison, Suite 3800
Number     Street

Chicago          IL        60602
City            State       ZIP Code

Contact phone  312.962.3537

Contact email  tohlms@proskauer.com

Where should payments to the creditor be sent? (if different)

Name

Number     Street

City            State       ZIP Code

Contact phone

Contact email

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**4. Does this claim amend one already filed?**

☐ No
☑ Yes.  Claim number on court claims registry (if known) 28

Filed on  02/10/2021
          MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes.  Who made the earlier filing? _____

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

**7. How much is the claim?**  $ _____ 23,388,251.79 . **Does this amount include interest or other charges?**

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Breach of Master Broker Agmnt. - See attached rider

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

Nature of property:

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*
☐ Motor vehicle
☐ Other. Describe: _____

Basis for perfection: _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property:  $_____
Amount of the claim that is secured:  $_____
Amount of the claim that is unsecured:  $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition:  $_____

Annual Interest Rate (when case was filed) _____ %
☐ Fixed
☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. Amount necessary to cure any default as of the date of the petition.  $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

| | | Amount entitled to priority |
|---|---|---|
| **12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No<br>☐ Yes. *Check one:* | |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | |

---

## Part 3:   Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   6 / 21 / 2021
                 MM / DD / YYYY

_____
Signature

**Print the name of the person who is completing and signing this claim:**

| | |
|---|---|
| Name | Peter C. Andoni |
| | First name     Middle name     Last name |
| Title | Chief Executive Officer |
| Company | ARKK Food Company, Inc. |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 1750 S. Telegraph, Suite 310 |
| | Number     Street |
| | Bloomfield Hills          MI     48302 |
| | City          State     ZIP Code |
| Contact phone | 248-484-4050          Email pandoni@arkkfood.com |

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| IN RE:<br><br>SIMPLY ESSENTIALS, LLC,<br><br>Debtor. | Involuntary Chapter 7 Bankruptcy<br>Case No. 20-00305<br><br>Hon. Thad J. Collins<br><br>**RIDER TO AMENDED PROOF OF CLAIM** |

Arkk Food Company, Inc. ("Claimant" or "ARKK") hereby submits this rider (the "Rider") in support of its amended proof of claim filed in the above-captioned bankruptcy case of Simply Essentials, LLC (the "Debtor" or "SE").

**A. Procedural History**

1. On February 10, 2021, Claimant filed Proof of Claim #28 (the "Original Proof of Claim") asserting a claim against Debtor for $7,498,703.27 for unpaid services, among other things, pursuant to a certain Master Broker Agreement (the "MBA"), a copy of which is attached hereto as **Exhibit A**. The Original Proof of Claim included an 11 U.S.C. § 507(a)(4) priority claim in the amount of $13,650.00.

2. On March 27, 2021, Pitman Farms filed an objection (Dkt. #95) to the Original Proof of Claim (the "Objection") contesting the amount and basis of the claim, as well as the assertion of priority under 11 U.S.C. § 507(a)(4).

3. On June 10, 2021, the Court entered a the *Joint Motion to Establish Pre-Trial Schedule*, filed by Claimant and Pitman Farms, setting June 21, 2021 as the deadline for Claimant

to file an amended proof of claim and establishing briefing and discovery deadlines in connection

with the same.

**B. Claim for Unpaid Commissions**

4.      As set forth in the Rider to the Original Proof of Claim (the "Original Rider"), in

or around September 2017, Claimant and the Debtor executed and agreed to the MBA.

5.      The MBA is a sales representative agreement, under which SE appointed ARKK to

serve as "master broker for SE for the purpose of promoting the sale of SE's products to

customers." MBA at p. 1. The geographic scope of the MBA was unlimited, and extended ARKK's

representations to all areas in which SE sells products:  "Master Broker is hereby authorized to sell

SE's products and services to any and all customers of SE during the term of this Agreement . . ."

MBA § 1(A).  Under section 1(B), SE agreed that ARKK "is being retained as the exclusive master

broker for all sales of SE's products." *Id.*

6.      The MBA awarded ARKK commissions on all of SE's sales, whether or not ARKK

actually procured the sale:

> **Receipts**.  Except as otherwise provided herein, [ARKK] shall be entitled to ***all
> commissions*** on those net receipts of sales, ***whether procured by [ARKK] or not***,
> to the extent collected by SE.

MBA § 6(A) (emphasis added).

7.      SE wrongfully failed to pay commissions on all SE sales, whether or not procured

by ARKK.  Many of SE's major customers were not included in SE's calculation of commissions.

8.      The accounts that SE has wrongfully excluded from its commission calculations

make up a significant proportion of the total commissions that should have been paid to ARKK

under the MBA.  For instance, in 2018, SE withheld at least 67% of the commissions owed, which

ARKK estimates should have resulted in more than $2.3 million in commissions that are still

unpaid.  SE also wrongfully withheld at least 2/3 of the commissions owed in 2019.

9.      The Debtor owes Claimaint at least $7,498,703.27 in unpaid commissions

calculated as follows:

| | |
|---|---|
| 2018 | Estimated Unpaid Commissions: |
| | $2,300,000.00 |
| 2019 | Estimated Unpaid Commissions: |
| | $2,300,000.00 |
| 2020 | Estimated Unpaid Commissions (prorated January 1 - August 10) |
| | $2,898,703.27 |

**TOTAL**:        $7,498,703.27

10.     In addition to the claim for unpaid commissions in the amount of $7,498,703.27,

the Original Rider also "assert[ed] that under the [MBA], [ARKK] is entitled to additional

expenses and fees including but not limited to late fees, appraisal fees, and legal fees to the extent

applicable." Original Rider ¶ 7.

**C. Amended Claim**

11.     The Original Rider expressly reserved Claimant's right to amend and supplement

the Original Proof of Claim. Original Rider ¶ 8 ("Claimant reserves the right to amend and

supplement the [Original Proof of Claim] including without limitation,…by its assertion of

additional claims….").

12.     Approximately nine months prior to the involuntary petition being filed against the

Debtor,  ARKK and the Debtor were parties to a certain Arbitration Proceeding pending in

3

Chicago. In the Arbitration Proceeding, ARKK sought damages on account of Debtor's breach of the MBA of at least $14,000,000.

13.     Under Delaware law, which governs the MBA pursuant to the choice of law provision in MBA § 15, courts generally award "expectation damages" for a breach of contract, which are intended to put the non-breaching party in the position it would have been in if the other party had performed the contract. *See VICI Racing, LLC v. T-Mobile USA, Inc*., 763 F.3d 273, 293 (3d Cir. 2014); *Ivize of Milwaukee, LLC v. Compex Litig. Support, LLC,* 2009 WL 1111179, at *10 (Del. Ch. Apr. 27, 2009) ("the question … is what [the non-breaching party] could have reasonably expected to receive pursuant to the terms of the [agreement] at the time the agreements were signed.").

14.     The original term of the MBA was from September 11, 2017 to September 11, 2019. MBA at p. 6 and at § 3(A). Simply Essentials did not terminate the agreement at any time during 2019, much less during the 45 day window provided for in the MBA. (*Id*.) As a result, the MBA was set to expire per its terms on September 11, 2021 with a ARKK being entitled to a one year tail period ending on September 11, 2022. MBA § 3(A) ("Master Broker shall be entitled to its Commission for all sales occurring during the term of this Agreement *and for a period of twelve (12) months thereafter*.") (emphasis added).

15.     If the Debtor had continued to perform its obligations under the MBA from the time of its breach in 2018 until its expiration on September 11, 2021 plus the one year tail period to September 11, 2022, ARKK would have been due $25,111,196.99 in commissions based on historical and projected trends. Thus, in addition to accrued and unpaid commissions in the amount

4

of $7,498,703.27, ARKK seeks expectation damages in the amount of $15,889,548.52,[1] for a total

claim of $23,388,251.79.

### D.  Reservation of Rights

16.    The Amended Proof of Claim and Rider are without waiver to Claimant's right to

further assert it is entitled to additional expenses and fees including but not limited to late fees,

appraisal fees, and legal fees to the extent applicable.

17.    The Claimant continues to reserves the right to amend and supplement this proof

of claim, including without limitation, by its assertion of a claim for additional unpaid

commissions owed to it and continuing costs and expenses (including attorneys' fees), and by its

assertion of additional claims.  The Claimant reserves the right to submit further evidence in

support of the claims asserted herein.  The Claimant reserves all rights of recoupment and setoff

to which the Claimant may be entitled to under applicable law.  The Claimant also reserves the

right to file additional requests for payment of administrative expenses.

18.    The execution and filing of this Amended Proof of Claim is not intended to waive

any other rights of the Claimant including, without limitation, the right to move to withdraw the

reference with respect to the subject matter of this claim or otherwise, any right to arbitration and

any right to trial by jury that the Claimant may have in any proceeding arising in or related to this

case, nor is the filing of this proof of claim a consent to jurisdiction of this or any court except with

respect to the allowance of the claims asserted herein.

---

[1] ARKK estimates total unpaid commissions for 2020 of $6,376,320.00 based on historical data and projected trends.
We conservatively used that same number through 2021 and through the tail period of September 11, 2022. This came
to a total unpaid commissions and expectation damages of $25,111,196.99.  From that gross number, we deducted our
estimated overhead related to the Simply Essentials contract and pro-rated it over the same time period for a total of
$1,722,945.21. After deducting out projected operating costs we came to total claim amount of $23,388,251.79.

19.     The execution and filing of this proof of claim shall not constitute:  (a) a waiver,

release, or modification of the Claimant's rights against any person, entity, or property; or (b) an

election of remedy.

Date:  June 21, 2021

/s/ *Todd J. Ohlms*
Todd J. Ohlms
Attorney for Arkk Food Company, Inc.

6

# EXHIBIT A

# MASTER BROKER AGREEMENT

THIS MASTER BROKER AGREEMENT ("Agreement"), made and entered into this _____ day of September, 2017, by and between SIMPLY ESSENTIALS, LLC, a Delaware limited liability company, whose address is 12980 Foster Street, Suite 220, Overland Park, KS 66213 ("SE"), being engaged in the business of selling and distributing food throughout the United States, and ARKK FOOD COMPANY, a Michigan corporation, whose address is 1750 S. Telegraph Rd., Suite 310, Bloomfield Hills, MI 48322 ("Master Broker") who is being engaged as master broker for SE for the purpose of promoting the sale of SE's products to customers.  SE hereby appoints, and Master Broker accepts such appointment, upon the following terms and conditions:

## 1.    Sales Procedure.

A.    **Authorization**.  Master Broker is hereby authorized to sell SE's products and services to any and all customers of SE during the term of this Agreement in accordance with the terms and conditions stated herein. Master Broker hereby agrees to sell such services in accordance with such reasonable terms and conditions as provided by SE. Master Broker shall promote the sale of SE's products continuously and shall make every reasonable effort to develop, as far is practicable, trade in the products. Master Broker shall comply with all reasonable SE instructions and guidance regarding the sale of SE's products including the prices, discounts, and sales policies of SE which will be provided to Master Broker and shall be subject to change from time to time upon prior written notice to Master Broker.

B.    **Broker Retention**.  The parties agree that Master Broker is being retained as the exclusive master broker for all sales of SE's products.  The efforts of Master Broker shall include promoting and encouraging third parties to purchase products from SE.

C.    **Master Broker Responsibilities**.  Master Broker will direct and manage all sales on behalf of SE.  Master Broker will provide sales support resources (including human resources and associated travel and entertainment expenses) necessary to manage the daily interface between the accounts and SE.  Sales support shall include but not limited to a minimum of four brand ambassadors to maintain and grow customer volumes and program initiatives.

D.    **SE Responsibilities**.  SE will be responsible for providing Master Broker with mutually agreed upon sales and marketing collateral and other materials required to support sales initiatives.  SE will further be responsible for funding any marketing and promotional programs to support branding and co-branding initiatives of SE's products in the targeted markets.

E.    **No Authority to Contract.**  Master Broker is not granted any right or authority to assume or create any obligation or responsibility, express or implied, on behalf or in the name of SE or to bind SE in any manner whatsoever, nor is Master Broker authorized to make any representations or warranties regarding the product, its utility, uses, useful life, delivery terms or credit except as specifically contained in the written literature

regarding the products supplied by SE.

**2.      Independent Contractor.**

A.      **Relationship & Taxes**.  SE and Master Broker acknowledge and understand that Master Broker is and shall be an independent contractor and that, as an independent contractor, Master Broker will not be treated as an employee with respect to such services provided to SE for federal, state and local tax purposes and that as such Master Broker shall be responsible for all expenses and obligations incurred by Master Broker in connection with its representation of SE except as provided in this Agreement.  Master Broker shall be solely and exclusively responsible for all tax obligations, including by way of illustration, but not limitation, Social Security, federal, state and local withholding taxes and any and all other obligations, but excluding any and all sales taxes or other taxes relating to the sale of SE's products. Master Broker shall indemnify, defend and hold SE harmless for payment of any sums determined to be due and owing as a result of Master Broker's failure to remit such tax obligation to the taxing authority arising exclusively out of the conduct of the business of Master Broker.  Master Broker shall advise all customers that it is an independent contractor of SE and is not authorized to bind SE in any manner or form.  SE shall indemnify, defend and hold Master Broker harmless for payment of any sums determined to be due and owing as a result of SE's failure to remit any tax obligation to the taxing authority arising exclusively out of the conduct of the business of SE.  The indemnities contained in the paragraph shall survive termination of this Agreement.

B.      **Compliance.**  Master Broker shall, at all times during the performance of this Agreement and other obligations hereunder comply with all current and future rules, regulations, and policies reasonably established by SE for its independent contractors, and Master Broker shall comply with all applicable laws, codes, rules, and ordinances of every applicable governing authority.

**3.      Duration, Cancellation, Effect of Termination.**

A.      **Duration.**  This Agreement shall begin as of the Effective Date (as defined below), and shall continue for a period of two (2) years ("Initial Term").  Thereafter, the term of this Agreement shall automatically renew for successive two (2) year terms unless one party provides written notice to the other party at least forty-five (45) days in advance of the end of the then-existing term that it does not wish to renew the term of this Agreement. As used in this Agreement, "Effective Date" means the day after the effective date of termination of Sanderson Farms, Inc. as a broker for SE under the terms of an Agreement dated January 31, 2017 between SE and Sanderson Farms, Inc. (the "Sanderson Agreement").  SE will use commercially reasonable efforts to terminate the Sanderson Agreement as soon as possible in light of the Albertson's implementation currently underway, and in any event no later than October 31, 2017.

B.      **Effect of Termination**.  In the event of termination of this Agreement, except as otherwise set forth herein, all of SE's obligations to Master Broker shall cease and be extinguished by its payment to Master Broker of commissions due on sales which have closed and for which SE has received payment prior to the date of notice of termination.

Notwithstanding the foregoing or anything herein to the contrary, Master Broker shall be entitled to its Commission for all sales occurring during the term of this Agreement and for a period of twelve (12) months thereafter. The terms of this paragraph shall survive termination of this Agreement.

        C.      **Return of Materials**.  Upon termination of this Agreement, Master Broker shall return to SE, upon demand from SE, all sales aids, promotional devices, sales policies, price lists, and all other property belonging to SE.

**4.**     **Compensation**.  Subject to the terms contained in this Agreement, the Master Broker shall receive the following compensation:

        A.      **Premium Pounds.**

        Tier 1:  $0.15 / lb.

        Tier 2:  to be determined on a case by case basis, but not less than $0.05 / lb. and not more than $0.15 / lb.

        Tier 3:  $0.005 / lb.

        B.      **Definitions.**

**Premium Pounds:**  Breast, Tenders, Wings, Thighs, Drums and Grinds sold as SE Air-Chilled Program sales.

**Tier 1 Pounds:**   All Premium Pounds with a sales price equal at least the price quoted to Albertsons accounts.

**Tier 2 Pounds:** All Premium Pounds that do not qualify as Tier 1 or Tier 3.

**Tier 3 Pounds:**  All over-run pounds that are sold at or less than the current market reported commodity price.

Note:  Future opportunities to sell non-primary pounds (backs, skin, paws, fat, etc.) will be addressed at a future date with a separate commission schedule.

**5.**     **Expenses.**   Master Broker shall be responsible for all expenses incurred by Master Broker in the performance of its services.

**6.**     **Terms of Commission.**

        A.      **Receipts.**   Except as otherwise provided herein, Master Broker shall be entitled to all commissions on those net receipts of sales, whether procured by Master Broker or not, to the extent collected by SE.

        B.      **Adjustment of Commissions**.  SE may adjust and reduce the commissions

by any discounts, reimbursements, billing errors and payment errors.

C.  **Payment of Commissions**.  All commissions shall be paid only with respect to actual payments received by SE.  Commissions shall be calculated on a monthly basis based on payments received by the fifteenth of the month whereby a commission check shall be issued to Master Broker with respect to such payments on or before the thirtieth of the month, except with respect to the month of February where the same shall be issued prior to the end of the month.

D.  **Commission Schedule**. Upon the payment of the Commission, SE shall submit to Master Broker a commission statement detailing the method by which the Commission was calculated.

E.  **Commissions on Termination**.  In the event the retention provided herein is terminated, Master Broker shall be paid commission thereafter in accordance with the terms of Section 3.B hereof.

**7.**  **Arbitration**. Except for equitable enforcement of this Agreement, the parties shall arbitrate any and all disputes arising out of this Agreement through the procedures and policies of the American Arbitration Association, unless other procedures are agreed upon in writing between the parties. Unless otherwise agreed, the arbitration shall take place in Chicago, Illinois.  The determination of the arbitrators in connection with interpreting this Agreement shall be binding and final upon all parties. The award of the arbitrator may be filed with the court(s) designated in Section 15, and judgment may be entered by the court upon the arbitration award and execution may be issued upon the judgment. The cost for arbitration shall be split equally between the parties or allocated by the arbitrator. The arbitrator shall have no power to change, modify or otherwise alter the nature of the business relationship between the parties and the arbitrator's written determination shall be based solely upon the existence of the relationship detailed in this Agreement.

**8.**  **Indemnification**.  Except to the extent arising out of Master Broker's breach of this Agreement, negligence or conduct, SE shall indemnify hold harmless, and defend Master Broker from and against any and all claims, demands, actions, liabilities, damages, and expenses of every nature and kind whatsoever, including, but not limited to, penalties, fines, assessments, interest, travel expenses, court costs, and reasonable attorney fees (collectively, "Losses") asserted against, imposed upon or incurred by Master Broker as a result of, or in connection with the conduct of business by SE, including, but not limited to, any Losses arising out of products supplied in connection with this Agreement (e.g., Losses arising from any defects in, or recalls of, SE's products).  Except to the extent arising out of SE's breach of this Agreement, negligence or conduct, Master Broker shall indemnify hold harmless, and defend SE from and against any and all Losses asserted against, imposed upon or incurred by SE as a result of, or in connection with, the performance of services hereunder by Master Broker.  The provisions of this Section shall survive the termination of this Agreement.

**9.**  **Successor and Assigns**. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns.

**10.** **Notices**. All notices required herein or given pursuant hereto, if any, shall be deemed effective and binding if given in writing by certified or registered mail, return receipt requested (regardless of whether the return receipt is received by sender) or any of the private next-day delivery carriers, or its equivalent, or given in person to the address as provided for herein and will be deemed effective on the date that the same is postmarked or dated for dispatch.

**11.** **Waiver of Action**. No action or omission by the parties, including, but not limited to, any extension, modification, amendment, forbearance, delay or concession with regard hereto, with or without notice to the other party, if any, is intended nor shall constitute or be deemed a waiver, discharge or release of a party or of any obligation or right established hereby, nor shall such action or omission constitute an approval or acquiescence in any breach hereof, except as may be expressly agreed in writing by the parties hereto.

**12.** **Conformity**. In the event any term, obligation, right, condition or provision hereof is held invalid, inoperative, void or unenforceable, the remaining provisions shall (i) remain in full force, (ii) in no way be altered, effected, impaired, invalidated or otherwise changed thereby, and (iii) be interpreted, construed and applied as though such offensive provisions were not in the first instances contained herein.

**13.** **Compliance.** Master Broker shall at all times during the performance of the duties and other obligations hereunder comply with all applicable laws, codes, rules and ordinances of every governing authority.

**14.** **Status Reports.** Master Broker shall on a regular basis submit a status report to SE, in a form reasonably acceptable to the parties, specifying the efforts expended by Master Broker for and on behalf of SE including, but not limited to, information regarding customers contacted, sales made, leads, marketplace trends, and other relevant information relative to the duties to be performed herein.

**15.** **Choice of Law.** This Agreement shall be governed, construed, and enforced in accordance with the laws of the United States of America and of the State of Delaware. In the event of a dispute hereunder, the parties agree that the exclusive jurisdiction and venue for resolution thereof shall be Wilmington County, Delaware.

**16.** **Force Majeure**. Except for payment obligations hereunder, any delay or failure of either party to perform its obligations shall be excused if, and to the extent, that it is caused by an event or occurrence beyond the reasonable control of the party and without its fault or negligence. By way of example, this includes acts of God; restrictions, prohibitions, priorities or allocations imposed by or actions taken by any governmental authority (whether valid or invalid); embargoes; fires; floods; windstorms; explosions; riots; natural disasters; wars; sabotage; inability to obtain power; or court injunction or order.

**17.** **Entire Agreement.** This Agreement represents the entire and integrated agreement between the parties and supersedes and cancels any prior or contemporaneous arrangements, understandings or agreements, whether written or oral, by and between the parties relative to the subject manner hereof. Any amendments hereto shall be in writing and

5

executed by both parties.

IN WITNESS WHEREOF, the parties have affixed their signatures on the date set forth below.

**ARKK FOOD COMPANY,**
a Michigan limited liability company

By:_____
    Keith Jahnke, Authorized Representative

Date:   9/11/17
_____

**SIMPLY ESSENTIALS, LLC**

By:_____
    Dennis Krause, Chief Executive Officer

Date:
_____

6

executed by both parties.


       IN WITNESS WHEREOF, the parties have affixed their signatures on the date set forth below.

**ARKK FOOD COMPANY,**        **SIMPLY ESSENTIALS, LLC**
a Michigan limited liability company

By:_____   By:_____
    Keith Jahnke, Authorized Representative    Dennis Krause, Chief Executive Officer

Date:                      Date:
_____        9/11/17

**EXHIBIT C**

Declaration of Todd Henning

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| In re: | Case No.: 20-00305 |
| SIMPLY ESSENTIALS, LLC, | Involuntary Chapter 7 |
| Debtor. | Hon. Thad J. Collins |
| | **DECLARATION OF TODD HENNING** |

I, Todd Henning, hereby declare, pursuant to 28 U.S.C. § 1746:

### I.     BACKGROUND AND QUALIFICATIONS

1.     I am currently an employee of Best Dressed Chicken, where I serve as Vice President of Sales and Marketing, Proteins.

2.     Prior to my employment at Best Dressed Chicken, I was a founder and Chief Operating Officer of Simply Essentials, LLC ("SE").

3.     I have over 25 years of experience in the food processing industry.

4.     Except as otherwise indicated, all facts and opinions set forth herein are based on (i) my personal knowledge or (i) my views, informed by my experience and knowledge of SE and the food processing industry, among other things.

### II.     FOUNDING OF SIMPLY ESSENTIALS, LLC

5.     I founded SE with my partner, Dennis Krause, in or around 2012 as a beef processing operation.  In 2015, we sought funding to expand our business into the poultry industry by building a poultry processing plant.

6.     SE secured approximately $34 million in funding from Tillridge Global Agribusiness Partners ("Tillridge") to expand its operations into the poultry industry. Approximately $28-$32 million of this funding went towards building the Charles City poultry

processing plant (the "Plant").  As part of the financing arrangement with Tillridge, Mr. Krause

and I owned approximately 1.7% each of SE, with Tillridge owning the remainder.

7.	Construction on the Plant, located in Charles City, Iowa, began in January 2016

and was completed in January 2017.  Operations began shortly thereafter.

8.	While I served as COO of SE, Mr. Krause served as CEO.  We were jointly

responsible for the management of SE, along with Mark Zenik, a representative of Tillridge.

While the Plant was located in Iowa, my colleagues and I ran SE's operations from an office in

Kansas City, Kansas as we continued the beef processing operations as well.

### III.	SE ENTERS INTO MASTER BROKER AGREEMENT WITH ARKK

9.	Carrying on SE's reputation from its beef operation, and in partnership with its

producers, SE was well regarded in the industry for selling the highest-end chicken product.

Indeed, the chicken obtained the highest claims qualification in the industry for the ratio of

omega 3 nutrients.

10.	Due to the premium nature of SE's chicken product, it was never intended to sell

as, or compete with, commodity chicken products, but was positioned to sell for substantially

higher margins and only the highest claims qualifications.

11.	To facilitate the sale of SE's premium chicken product, on or around September

2017, SE executed and agreed to a sales representative agreement, the Master Broker Agreement

(the "MBA"), with Arkk Food Company LLC ("ARKK").  On behalf of SE, I personally worked

with Keith Jahnke and Peter Andoni of ARKK in negotiating and memorializing the relationship

between SE and ARKK in the MBA.

12.    The MBA was intentionally structured as a "non-procuring cause" commissions contract wherein SE was obligated to pay ARKK commissions on all of SE's sales, whether or not ARKK actually originated the sale, in exchange for ARKK's nationwide brokerage services.

13.    While SE could have sought to structure the MBA as a "procuring cause" commissions contract, we purposely structured the MBA as a non-procuring cause commissions contract because, among other things (a) SE employed no dedicated personnel to sell its chicken product or maintain relationships with its clients, (b) the specialized nature of selling premium chicken product at high margin, (c) the focus of selling the whole chicken, not just the white meat, in order to maximize sales and profits, and (d) our knowledge of ARKK's extensive nationwide network.

14.    While ARKK was pivotal in originating major accounts for SE, including with Albertsons grocery chains, under the MBA, ARKK would still receive a commission for accounts it did not originate because ARKK would build upon SE's connections and maintain the relationship with the client by, among other things, positioning an active broker in the geographical area to handle the client's account.

15.    As set forth in the MBA, for certain chicken products, the percentage of ARKK's commissions would be adjusted by mutual agreement based upon factors including, but not limited to, (i) whether ARKK procured the account, (ii) whether ARKK assigned an active broker in the area to maintain the account, (iii) the primary pounds purchased by the client, (iv) the margin on the sale of the chicken product, and (iv) whether the whole bird (i.e. both white and dark meat) would be sold to the client and at what margin.

16.     Under Tillridge's ownership, administration of SE's obligations owed to ARKK under the MBA was straightforward.  The parties routinely discussed and agreed where these commissions would fall in the permissible range identified in the MBA.

17.     ARKK's commissions could only be calculated if SE provided ARKK with records of it sales.  To that end, SE maintained detailed records of how many chickens the Plant was receiving and harvesting weekly and how many pounds of product each chicken yielded.  We maintained open communication with our partners at ARKK, principally Peter Andoni and Keith Jahnke, and regularly shared the data that was necessary for ARKK to understand our commission calculations and evaluate them for accuracy.

18.     To calculate the commissions ARKK was due under the MBA, SE accountants would produce Excel sheets detailing the purchase orders and the numbers of chickens harvested on a weekly basis.  I reviewed the sheets before SE would send them to ARKK.  Following that, there would be a discussion on the sales and what tier of commission should be applied under the MBA.

IV.   **SALE OF SE TO PITMAN FAMILY FARMS**

19.     In or around November 2017, Tillridge was winding down its portfolio and was looking to sell both SE's beef and poultry operations.  SE entered into an asset purchase agreement with ARKK for the sale to ARKK of the beef aspects of SE's business.  Meanwhile, on behalf of SE, Tillridge negotiated a stock purchase agreement with Pitman Family Farms ("Pitman") for the purchase of the poultry aspect of SE's business, including the Plant (the "Pitman Purchase").

20.     It is my recollection that, as part of the sale, Pitman would be required to pay Tillridge $8 million for SE and would also pay an "earn-out" of 80% of the EBITDA of SE for

4

the first year of operations post-closing.  It is my understanding that Pitman ultimately paid

Tillridge only $1 million of the $8 million due at closing.

21.     As part of the Pitman and ARKK acquisitions of SE's business, the approximately

1.7% shares each that Mr. Krause and myself owned of SE were bought out.  I maintain no

equity interest in SE and have not filed a proof of claim in SE's chapter 11 case.

22.     During the pre-closing period, I participated in phone conversations and meetings

discussing various aspects of SE's poultry business and our operations as Pitman performed its

due diligence.  For this due diligence, a data room was established, and was loaded with SE's

contracts and operational documents, among other information.

23.     Post-closing, I met David Pitman for the first time in person.  We met in Kansas

City to review SE's office operations and then drove to the Plant in Iowa together.  From our

discussions, I believe that Mr. Pitman preferred to view his purchase more as the purchase of

SE's assets rather than what it was:  the purchase of SE's stock, whereby he assumed SE's

liabilities, contractual duties with various suppliers and customers, including ARKK, and SE's

obligations under certain New Market Tax Credits.

## V.    PITMAN ATTEMPTS TO AVOID CONTRACTUAL LIABILITY

24.     Shortly after the Pitman Purchase, Mr. Pitman placed two of his accountants in

charge of maintaining SE's accounts and invoices.  The efficiency of our previous accounting

practices began to break down almost immediately.  Customers were not receiving invoices.

Product was not being accounted for.  It is my understanding that Mr. Pitman's accountants were

simultaneously responsible for the accounting at Pitman Family Farms, Mary's Chicken, another

Pitman company in Utah, and Simply Essentials.

25.     Communication with ARKK and clients nearly ceased.  Because ARKK's commissions under the MBA, and our previous practice, depended on transparent communication and the accuracy of our accounting, the relationship between ARKK and SE began to deteriorate.

26.     David Pitman expressed his displeasure to me that the non-procuring cause nature of the MBA required SE to pay commissions on all SE sales, including those that ARKK did not originate.  I personally accompanied David Pitman to an in-person meeting with representatives of ARKK to determine if the MBA could be renegotiated.  It was my impression that David Pitman refused to pay ARKK anything further, and, ultimately, negotiations were unsuccessful.

## VI.     DIVERSION OF SE CHICKEN PRODUCT TO MARY'S CHICKENS IN CALIFORNIA

27.     Following Pitman's acquisition of SE, I continued my practice of reviewing the weekly Excel sheets detailing our purchase orders and number of chickens harvested to share with ARKK and calculate the commissions under the MBA.  I cannot verify whether, as was previously done, these sheets were consistently shared with ARKK and whether there were discussions on the amount of commissions due to ARKK.

28.     On or about January 2018, a few months after Pitman's acquisition of SE and the replacement of SE's previous accountants, I began to notice serious discrepancies in SE's records between the number of chickens the Plant was receiving and the amount of product sold that was attributed to the SE.

29.     The discrepancy was the result of the regular process of poultry, originating from SE's work at the Plant, being diverted to Pitman's other business, Mary's Chicken, located in California for harvesting and ultimate sale under the Mary's Chicken label.  Based on information and belief, SE received no value in exchange for the diverted chicken.

6

30.     The diverted poultry, rather than being properly accounted for as part of SE's Plant's output, was being accounted for as the output of Mary's Chicken. The SE chicken, which was being sold instead under the Mary's Chicken label, was being sold to the same clients who were supposed to be receiving the SE chicken. This diversion drastically reduced SE's sales and revenues (and ultimately EBITA), and thus enabled SE to reduce the revenues attributable to Tillridge's earn-out under the purchase agreement and the sales commissions owed to ARKK under the MBA.

31.     The diversion of SE's poultry was readily ascertainable at the time through "Nova," the computerized record system used by SE. Based on my review of those records at the time, it is my understanding that this diversion of product to Pitman's company in California occurred on a weekly basis. The diversion included, on average, 5 to 7 truckloads of harvested poultry per week. Each truckload of harvested poultry contains approximately 10,000 "wogs," or a whole bird without giblets, weighing approximately 40,000 pounds. Given the variety of cuts the Plant harvested from each chicken, and the quality of SE's product then, the overall price for each pound was approximately two dollars. Assuming this pattern continued consistently for the approximately 80 week period from January 2018 to the Plant's closure in August 2019, I estimate that approximately $32 million in revenue was diverted by Pitman from SE to Mary's Chickens or other Pitman-owned subsidiaries.

32.     Under the MBA, ARKK was entitled to a commission on any poultry produced at the Plant and sold by SE. Due to Pitman's intentional diversion of substantial amounts of poultry from the Plant to Mary's Chicken in California, and the failure to account for this product as SE sales, I do not believe that SE was paying ARKK the commission owed under the MBA.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 20, 2021 at [City], [State].

Todd Henning

2